# Completed Form and Motions in Case 2:21-cv-03683-GJP THOMAS v. JUNE et al

### Important Privacy Notice

Federal Rule of Civil Procedure 5.2 prohibits litigants in a non-habeas proceeding from submitting documents that contain personal information. Unless the Court orders otherwise, personal identifying information in Court filings must be limited as follows:

• Social security numbers, taxpayer-identification numbers, and financial **account numbers must include only the last four digits** (e.g., xxx-xx-1234)

• Birth dates must **include the year of birth only** (e.g., xx/xx/2000)

• Names of persons under the age of 18 must be indicated by **initials only** (e.g., A.B.)

You are responsible for protecting the privacy of this information in your filings. If your documents, including attachments, contain any information that does not comply with this rule, please black out that information before sending your documents to the Court.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

*DARRON A THOMAS*

_____

_____

*(In the space above enter the full name(s) of the plaintiff(s).)*

- against -

*CHAD JUNE*
*ASHLEY BANKS.*
*City of Philadelphia*
*Commonwealth of Pennsylvania*
*Prothonotary or Registrar Municipal Court of Philadelphia*
*Municipal Court of Philadelphia Administrator*
*Transfer being Officers at the Municipal Court*
*4 Security Officers at the Municipal court of Phila*
*Also see item 5 of the attached Complaint*

_____

*(In the space above enter the full name(s) of the defendant(s). If you
cannot fit the names of all of the defendants in the space above,
please write "see attached" in the space above and attach an
additional sheet of paper with the full list of names. The names
listed in the above caption must be identical to those contained in
Part I. Addresses should not be included here.)*

**COMPLAINT**

Jury Trial: ☐ Yes  ☐ No

*(check one)*

I.       **Parties in this complaint:**

A.       List your name, address and telephone number.  If you are presently in custody, include your identification
number and the name and address of your current place of confinement.  Do the same for any additional
plaintiffs named.  Attach additional sheets of paper as necessary.

| Plaintiff | Name | *DARRON A THOMAS* |
|---|---|---|
| | Street Address | *87 W SHARPNACK STREET* |
| | County, City | *PHILADELPHIA* |
| | State & Zip Code | *PA, 19119* |
| | Telephone Number | *215 570 3943* |

Rev. 10/2009

B.   List all defendants.  You should state the full name of the defendants, even if that defendant is a government agency, an organization, a corporation, or an individual.  Include the address where each defendant can be served.  Make sure that the defendant(s) listed below are identical to those contained in the above caption. Attach additional sheets of paper as necessary.

Defendant No. 1      Name _CHAD  JUNE_
                     Street Address _1601  John  F Kennedy Blvd_
                     County, City _Philadelphia, P_
                     State & Zip Code _PA, 19102_

Defendant No. 2      Name _Ashley Banks_
                     Street Address _3rd Floor, 87 W Sherprack Street_
                     County, City _Philadelphia_
                     State & Zip Code _PA, 1919_

Defendant No. 3      Name _Danielle M. Outlaw (Police Commission_
                     Street Address _750 Race Street_
                     County, City _Philadelphia_
                     State & Zip Code _PA, 19106_

Defendant No. 4      Name _Bradley K. Moss SJ_
                     Street Address _1339 Chestnut Street_
                     County, City _Philadelphia_
                     State & Zip Code _PA, 19107_

_For additional defendants please see item 5 or attach attached Complaint_

**II.   Basis for Jurisdiction:**

Federal courts are courts of limited jurisdiction. Only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case involving the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen of another state and the amount in damages is more than $75,000 is a diversity of citizenship case.

A.   What is the basis for federal court jurisdiction? *(check all that apply)*
     Q  Federal Questions          Q  Diversity of Citizenship

B.   If the basis for jurisdiction is Federal Question, what federal Constitutional, statutory or treaty right is at issue? _Please see items 2, 4 and 125 of the attached complaint, Brief and Memorandum of Law_

C.   If the basis for jurisdiction is Diversity of Citizenship, what is the state of citizenship of each party?

Plaintiff(s) state(s) of citizenship   *N / A*

Defendant(s) state(s) of citizenship   *N / A*

**III.   Statement of Claim:**

State as briefly as possible the facts of your case. Describe how each of the defendants named in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets of paper as necessary.

A.   Where did the events giving rise to your claim(s) occur? *Please see items 6 - 70 of the attached complaint.*

B.   What date and approximate time did the events giving rise to your claim(s) occur? *Please see items 6 - 70 of the attached complaint.*

C.   Facts: *Please see items 6 - 70 of the attached complaint*

| What happened to you? |
| Who did what? |
| Was anyone else involved? |
| Who else saw what happened? |

Rev. 10/2009                          - 3 -

**IV.    Injuries:**

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received. *Please see items 6 - 70 of the attached complaint.*

**V.    Relief:**

State what you want the Court to do for you and the amount of monetary compensation, if any, you are seeking, and the basis for such compensation. *Please see items 56 - 70 of the attached Complaint*

Rev. 10/2009                          - 4 -

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _13_ day of _August_ , 20 _21_ .

Signature of Plaintiff _D. Thomas_
Mailing Address _87 W Sharpnack Street_
_Philadelphia_
_PA, 19119_
Telephone Number _215 570 3943_
Fax Number *(if you have one)* _____
E-mail Address _darronsthomas@gmail.co_

Note:   All plaintiffs named in the caption of the complaint must date and sign the complaint. Prisoners must also provide their inmate numbers, present place of confinement, and address.

For Prisoners:

I declare under penalty of perjury that on this _____ day of _____, 20_____, I am delivering this complaint to prison authorities to be mailed to the Clerk's Office of the United States District Court for the Eastern District of Pennsylvania.

Signature of Plaintiff: _____
Inmate Number _____

*Rev. 10/2009*                         - 5 -

# Amended Attached Complaint Case 2:21-cv-03683-GJP THOMAS v. JUNE et al – Fed. R. Civ. P. 15(a)

# Nature of the Action and Jurisdiction

1. This case is brought to enforce the State of Pennsylvania's and the City of Philadelphia's constitutional obligations to ensure that any "law [or ordinance] which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained. Under the guise of protecting the public interests the legislature may not arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations." *Warren v Philadelphia* 1956." Furthermore, and more specifically the Plaintiff brings this action to protect both his due process rights and equality protection under the law rights under the U.S. Constitution. More specifically, Plaintiff now seeks a preliminary and permanent injunction, and a declaration that Section 9-3901(4)(e) [and/or combined with 9-3902 and/or 9-3903] of the Philadelphia Home Code is invalid, under the supremacy clause of Article six(6) of the Constitution, because it is pre-empted by, or is inconsistent with, Article I(1) and/or Article I(11) of the Pennsylvania Constitution — also see PA R. Civ. P. 128(c) — and/or the First, the Fifth and/or Fourteenth Amendment of the U.S. Constitution in so far as the alleged infirmed statute breaches the Plaintiff's right to petition [the courts], acquire, possess, protect and/or defend property and/or property interests; and not to be deprived of said property without due process of law or the equal protection of the law. More generally, hereafter reference to the "Philadelphia Ordinances" Is intended to implicate 9-1601, 9-1602, 9-1603, 9-1604, 9-1605, 9-3901, 9-3902 and/or 9-3903 of the **PHILADELPHIA HOME RULE CHARTER** and/or **THE PHILADELPHIA CODE** in conjunction with Rule 109(c) of the Compiled Rules of the Municipal Court of Philadelphia.

2. Plaintiff brings action pursuant to 42 U.S. Code, section 1983 and also challenge, as applied to the plaintiff, and more generally, Defendants' unconstitutional, unreasonable, unjust, harsh, oppressive, draconian, confiscatory, standardless delegation of power and/or arbitrary decision to enact and enforce sections 502-504 of the Landlord-Tenant Act of 1951; sections 9-3901(4)(e), combined with sections 9-1601, 9-1602, 9-1603, 9-1604, 9-1605, 9-3901, 9-3902 and/or 9-3903 of the **PHILADELPHIA HOME RULE CHARTER** and/or **THE PHILADELPHIA CODE** in conjunction with Rule 109(c) of the Compiled Rules of the Municipal Court of Philadelphia; and/or the City of Philadelphia Police Department Citizen Information Bulletin #3 Landlord-Tenant Disputes, hereafter collectively referred to as "the infirmed city or state statutes," without imposing any burdens on tenants who simply refuse to pay rent and have been given notice and an opportunity to find alternate accommodation. The Plaintiff also brings action for breach of his First Amendment Rights to petition the government, in this case the courts, in a timely fashion, such as that provided for in sections 501-504 of the Landlord Tenant Act of 1951, and for breach of the Contracts Clause of the U.S. Constitution where police officers, under the Command of the Police Commissioner, afford "tenants" immediate repossession where the tenancy contract is suitably suspended

for breach of a material condition or has been terminated. Furthermore, this Complaint brings action because the Philadelphia Ordinances are void because they contradict the Commonwealth of Pennsylvania's Rent Withholding Act. This action also includes the Plaintiff seeking damages for breach of contract in the amount of $7,630, the rental amount for the remainder of the contract; damage to the property's physical structure in the amount of $3,000; and unpaid rent and fees in the amount of $4,000.

3. Plaintiffs further requests that the court exercise its inherent powers to facilitate a challenge to the constitutionality of the prohibition on late fees under the Emergency Housing Protections Act (EHPA) given the City of Philadelphia's voluntary participation in, and receipt of funds under, the Federal Government's CDC Emergency Rental Assistance Funding (**CDC ERA Funding**) program which allows for the collection of late fees.

## Jurisdiction and Venue

4. The Federal courts in the district of Philadelphia have jurisdiction because "[t]he question whether any particular statutory provision is so related to the public good and so reasonable in the means it prescribes as to justify the exercise of the police power, is one for the judgment, in the first instance, of the law-making branch of the government, but its final determination is for the courts." *Warren v Philadelphia 1956.*" Furthermore, the Constitution is federal law and "[o]nce a state is participating, however, any of its legislation that is contrary to federal requirements is void under the Supremacy Clause."

## Parties

5. Darron Thomas is a private landlord who holds a 2-4 Unit Owner Occupied Housing License and rents two units at premises at 87 W Sharpnack Street, Philadelphia PA 19119 where he is owner and lives in a third unit at the property. The defendants in the case are the City of Philadelphia, the Commonwealth of Pennsylvania, the Commissioner of Police for the City of Philadelphia (Danielle M. Outlaw), officers of the last two named defendants, Ashley Banks and other persons employed by the government of Philadelphia and either work at the Municipal Court of Philadelphia, at City Hall in Philadelphia or have duties to enforce the alleged infirmed city or state statutes. These defendants include Chad June and at least two other employees present at City Hall on August 05, 2021, as well as at least four security guards summoned by Chad June and associates; the Prothonotary and/or Registrar of the Municipal Court of Philadelphia; Municipal Court Administrator, Landlord-Tenant Officer and Bradley K Moss SJ; two officers of the Municipal Court of Philadelphia who authorized or transcribed Darron Thomas' Complaint of July 16, 2021 onto appropriate court forms and at least four police personnel or court security staff that said court officers summoned to intimidate Darron Thomas. The unnamed parties are to be named upon retrieval of the CCTV footage of each location at each of the relevant dates and times. In so far as there is a challenge for equitable relief regarding the unconstitutionality of the infirmed city or state statutes the relevant officials are being named in their personal capacity. As guarantor of the tenancy agreement between Darron Thomas and Ashley Banks, Alexis Banks of 4717 Tampa Street, Philadelphia, PA 19120 is also a defendant in these proceedings.

6. The Plaintiff now seeks an amendment under rule 205.4(d) due to matters that arose during and after the filing of July 16, 2021. Plaintiff now seeks a declaration that Section 9-3901(4)(e) [and/or combined with 9-3902 and/or 9-3903] is invalid, under the supremacy

clause of Article six(6) of the Constitution, because it is pre-empted by, or is inconsistent with, Article I(1) and/or Article I(11) of the Pennsylvania Constitution — also see PA R. Civ. P. 128(c) — and/or the Fifth and/or Fourteenth Amendment of the U.S. Constitution in so far as the alleged infirmed statute breaches the Plaintiff's right to acquire, possess, protect and/or defend property and/or property interests; and not to be deprived of said property without due process of law. That is, the alleged infirmed city or state statutes seeks to give possession of the property of landlords to non-complying (former) tenants or squatters while depriving the landlord of the right to seek to evict such tenants or to charge rental rates above $0. This is so because the infirmed city or state statute bars court action by the landlord to recover possession, and to collect rent; theCommissioner of Police and ordinary police officers are under a duty to allow "tenants" to immediately regain possession; and sections 502-504 of the Landlord Tenant Act of 1951, together with judicial development as outlined in *Wofford v Vavreck*, bars self-help evictions such that the effect of the infirmed state statute is confiscatory and, therefore, invalid and/or unconstitutional— see *Ex parte Young*, 209 U.S. 123 (1908), Page 209 U. S. 147 of . Together, the last two bars foreclose a landlord's rights to acquire, possess, protect and/or defend property and/or property interests. NB: The Prothonotary, Municipal Court Administrator, Landlord-Tenant Officer and Bradley K Moss SJ — see Federal Rule of Civil Procedure 19(a) — are proper defendants as articulated in *Finberg v Sullivan* [see Section A within the majority decision case] (https://www.casemine.com/judgement/us/5914c4a0add7b049347ced06#p53).

7.  The Prothonotary, Municipal Court Administrator, Landlord-Tenant Officer and Bradley K Moss SJ by virtue of his/her official office has "some connection" to the enforcement of the infirmed city or state statute in that it is the Prothonotary, Municipal Court Administrator, Landlord-Tenant Officer and Bradley K Moss SJ who either notifies the court of failure to obtain a license or rejects documents that a plaintiff landlord seeks to file. As such, this is a suit against the Prothonotary, Municipal Court Administrator, Landlord-Tenant Officer and Bradley K Moss SJ personally — thus the Eleventh Amendment Bar does not apply, see *Ex Parte Young*, Page 209 U. S. 151 through Page 209 U. S. 152   Page 209 U. S. 158 — and this suit should avoid summary judgment under Federal Rule of Civil Procedure 56. *Ex parte Young*, 209 U.S. 123 (1908) (https://www.casemine.com/judgement/us/5914aa09add7b0493471b6c6#p157) ).

8.  The Prothonotary, Municipal Court Administrator, Landlord-Tenant Officer and Bradley K Moss SJ or persons acting on behalf of, or with the authority of, the Prothonotary, Municipal Court Administrator, Landlord-Tenant Officer and Bradley K Moss SJ has worked injury to the Plaintiff in the instant case, and other plaintiff landlords, by notifying the court that such plaintiffs are not in compliance with the alleged infirmed city or state statute. Further, said persons have also required Plaintiff to sign documents indicating that his court action may be dismissed prior to hearing because of failure to comply with the alleged infirmed city or state statute.

# Facts and General Allegations

9.  All statements in this section are to be read as though the words "it is alleged that" appears at the beginning of each enumerated item.

10. In 2007 Darron Thomas obtained a Commercial Activity License by registering a company whose short form name is "REEFACTS".

11. Circa July/August 2016 Darron Thomas was registered by the Department of Wills and Probate as a legitimate heir of, and executor of the estate of, Sonia Larry. Furthermore, these circumstances cause Darron Thomas to satisfy the definition of "owner" as set out in the Philadelphia Home Code.

12. Circa October/November 2016 Darron Thomas obtained a 2-4 Unit Owner Occupied Housing License Number, 719012.

13. Circa October/November 2016 and 2017 Darron Thomas obtained a number, 2836252, which was associated with taxes Darron Thomas was to pay to the City of Philadelphia in connection with his 2-4 Unit Owner Occupied Housing License.

14. A requirement to obtain a 2-4 Unit Owner Occupied Housing License, as with all other related license in the City of Philadelphia, is that the applicant has a Business Income and Receipts Tax (BIRT) number — see Exhibit 109.

15. Where a landlord qualifies for a 2-4 Unit Owner Occupied Housing License, a 2-4 Unit Owner Occupied Housing License is a substitute for a Commercial Activity License (CAL — see Exhibit 109.

16. On August 5, 2021 officers of the Department of License and Inspections in the City of Philadelphia had already verified Darron Thomas' Social Security Number and city tax number before they claimed that there was a problem with his social security number and that he needed to apply for a new BIRT — see Exhibit 107.

17. On July 01, 2020 Philadelphia's Mayor Kenney signed the Emergency Housing Protection Act ("EHPA") — see footnotes 18-23 and 31, and associated text, of *HAPCO v Philadelphia*.

18. Bill No. 200302 is a part of the EHPA and makes it temporarily unlawful for landlords to charge or accept late fees on rent, interest on back rent, or similar charges as a result of delinquent payment of rent for residential tenants who have experienced a COVID-19 financial hardship.

19. As of November 12, 2020, and possibly earlier, Philadelphia participated in rental assistance programs paid for by funds allocated to the city under the CDC ERA Funding — (retrieved August 11, 2021) https://www.phila.gov/2020-11-12-city-announces-additional-30-million-in-funding-for-rental-assistance-and-small-business-relief/#:~:text=Federal%20CARES%20Act%20funding%20allowed%20the%20City%20to,4%2C000%20households%20with%20up%20to%20%242%2C500%20in%20aid.

20. Between March 30, 2020 and June 30, 2021, in contradiction of the federal guidelines of the CDC ERA Funding, Philadelphia prohibited the collection of late fees due to non-payment or late payment of rent.

21. As at July 16, 2021, the compiled rules of the Philadelphia Municipal court at rule 109(b)(3) provides: "Citation of the section or sections of the statute, code, or ordinance alleged to have been violated.". However, the Municipal Court's Notice of Noncompliance associated with the very said rules by stating "[a]s a result of your failure to submit the required documents, you may not be able to collect rent for certain months and/or be unable to evict the tenant because of a Philadelphia Ordinance that prohibits a landlord from collecting rent or evicting a tenant under those circumstances" fails to identify the section or sections of the statute, code, or ordinance alleged to have been violated — see Exhibit 106.

22. Between March 22, 2021 and April 01, 2021 Ashley Banks (as tenant) and Darron Thomas (as landlord) entered into a written lease agreement for Ashley Banks to rent the third floor of

the property at 87 W Sharpnack Street, Philadelphia, PA 19119 for a period of one year, thereafter converting to tenancy at will.

23. Between March 22, 2021 and April 01, 2021, Alexis Banks signed as guarantor for Ashley Banks on the tenancy agreement between Darron Thomas and Ashley Banks.

24. Under the tenancy agreement, Ashley Banks is required to make rental payments via Zillow on or before the 25th day of each month.

25. Between March 22, 2021 and April 01, 2021, in the tenancy application process, Ashley Banks omitted that she was a tenant at 6055 N NORWOOD STREET PHILADELPHIA, PA 19138 during 2017, and that, she was evicted from said premises for non-payment of rent in 2017 — see Exhibit 103.

26. Between March 22, 2021 and April 01, 2021, in the tenancy application process, in direct contradiction to her 2017 eviction, Ashley Banks made the following claims:
    a) "I pay on time and will leave your property as I came in it I stay to myself go to work come home take care of my responsibilities pretty much a home body" — see Exhibit 104.
    b) That with the exception of 2018-2019 she lived with her mother at 4717 Tampa Street, Philadelphia PA — see Exhibit 103.
    c) That the owner of 4717 Tampa Street, Philadelphia PA was selling the property and this was the reason she was moving from 4717 Tampa Street, Philadelphia PA — see Exhibit 103.

27. Between April 01, 2021 and July 25, 2021 Ashley Banks stored a growing number of items in the stair way and common area of the property at 87 W Sharpnack Street, Philadelphia, PA 19119.

28. Circa June 29, 2021 Darron Thomas advised all tenants at 87 W Sharpnack Street, Philadelphia, PA 19119 that any items stored on the stairs, in the common area or in the stair way presents a hazard and should be moved. The other tenant removed on item she had in the designated areas. Ashley Banks failed to remove her items and claimed she was waiting for help. Those items remained in the designated areas until around July 25, 2021. In the interim Ashley Banks added other items to the ones she had already had in the designated areas.

29. Between July 17, 2021 and August 01, 2021, on multiple nights, during multiple weeks, on each of these nights between the hours of 2 AM and 4 AM, Ashley Banks entertained multiple men for around twenty minutes to an hour. She later claimed that these men were the fathers of her children and that they were visiting.

30. Circa July 19, 2021, in violation of a material condition of the lease, Ashley Banks moved in an adult female into the property. Said female was provided entry to the main building by Ashley Banks, entered the main building at around 3 AM in the morning, but apparently did not have keys to enter Ashley Bank's apartment. Said female knocked incessantly for about 30 minutes before Darron Thomas was compelled to leave his own apartment and ask her to desist from creating a noise nuisance at that time of the morning. In Darron Thomas' conversation with said female she indicated that she lived there and that she did not have to answer Darron Thomas' questions. Said female remained at the property until the night of August 03, 2020 when she left after Darron Thomas insisted that he would not open the secondary lock until the police had arrived.

31. Circa July 25, 2021 to August 08, 2021 Ashley Banks indiscriminately stored garbage — garbage was not carried out on trash day nor was such garbage placed in provided garbage bins — on the property and at the front of the property

32. Circa June 26, 2021 Ashley Banks caused flooding at the property 87 W Sharpnack Street, Philadelphia, PA 19119.

33. Between June 25, 2021 and August 2021 Darron Thomas, on multiple occasions advised Ashley Banks that she needs to connect utilities in her own name in accordance with the conditions of the rental agreement. To date Ashley Banks has failed to follow the relevant conditions of the rental agreement.

34. Circa June 26, 2021, Darron Thomas discussed the flooding with Ashley Banks. In response, among trying to raise a, Ashley Banks claimed that claim that someone had walked into her apartment the night before and that, despite Darron Thomas knocking and announcing himself several times, it was improper for Darron Thomas to enter her apartment to address. Ashley Banks further threatened that she has a gun and if anyone enters her apartment again she will use that gun such that the police will have to be called.

35. Circa June 28, 2021, Darron Thomas received notice that Ashley Banks' rental payment via Zillow had failed — see Exhibits submitted with July 16, 2021 filing .

36. Between June 28 and July 06, 2021, Darron Thomas advised, and provided formal notice to, Ashley Banks that her rent was unpaid. To date Ashley Banks has failed to make said rent payment plus other(s) which have become due since that time — see Exhibit.

37. Between March 22, 2021 and August 01, 2021, Ashley Banks and/or Alexis Banks:
    a) did not satisfy, or attempt to satisfy, the conditions of the Rent Withholding Act under which rent can be withheld;
    b) did not satisfy, or attempt to satisfy, financial hardship conditions, as, for example, set out under regulations promulgated in relation to the CDC ERA Funding;
    c) did not pay rent as should be executed on June 25th and July 25th, and due on July 01 and August 01, respectively;
    d) acknowledged the landlord's notice to quit and indicated that she had taken up the opportunity to move out on or before August 02, 2021;
    e) at around 11:30 PM on August 01, 2021, reneged on her commitment to move out on or before August 02, 2021;

38. Circa August 02, 2020 Ashley Banks supplied documents to indicate that she had at least $2,200 in a bank account — see Exhibit 108.

39. On August 03, 2021 the police were summoned because Darron Thomas' scheduled locking of a special/secondary lock on the entry doors was not cancelled on short notice in response to Ashley Banks reneging on her commitment to move out. The police, without providing any documents and in violation of The Philadelphia Police Department Citizen Information Bulletin #3, indicated that she had an immediate right of repossession — see Exhibit 107.

40. On August 08, 2021 the secondary lock was inadvertently locked and Ashley Banks was locked out. Darron Thomas on his own motion voluntarily opened the door for Ashley Banks. Ashly Banks started to shout at Darron Thomas while she video recorded the incident. Her son who is about seven (7) years old playfully approached Darron Thomas, who did not react to the child's approach. Ashley Banks called the police and made claims that Darron Thomas was aggressively interacting with her children. The police officer on scene refused to provide any documents or the DC number of the complaint to Darron Thomas. Darron Thomas video recorded a portion of his interaction with said police officer.

41. Landlords are left as sitting ducks, open to any irascible conduct that such a tenant may exude. The unreasonableness is underscored when it is acknowledged that "the tenant's obligation to pay rent and the landlord's obligation imposed by the implied warranty of habitability to provide and maintain habitable premises are mutually dependent. Therefore,

a material breach of one of these obligations will relieve the obligation of the other so long as the breach continues.

42. Between 3:30 PM and 4:30 PM on July 16, 2021, Darron Thomas presented at the Municipal Court of Philadelphia to file a Complaint seeking possession, outstanding rent and late fees. At that time officers of the Municipal Court of Philadelphia on the 10th Floor of 1339 Chesnut Street, Philadelphia PA singled out Darron Thomas and attempted to prevent Darron Thomas from filing an eviction and money judgment complaint against Ashley Banks. Furthermore, said officers called security or police to intimidate Darron Thomas and under the supervision of said "law enforcement officers" intimated Darron Thomas to facilitate violation of Darron Thomas rights under rule 109(c)(3)(i) of the compiled rules of the Municipal Court of Philadelphia by omitting items (II) and (III) from the written complaint submitted by Darron Thomas when they transcribed said written claim onto the prescribed court form. It is necessary to obtain the CCTV footage of the 10th Floor of 1339 Chesnut Street, Philadelphia PA to prove this fact. Also see Exhibit 101, Exhibit 102 and Exhibit 110.

43. Officers of the City of Philadelphia acted in breach of section 502 of the Landlord Tenant Act of 1951 by:
   a) On July 16, 2021 not substantially reciting the complaint as submitted, as required
   b) Between July 16, 2021 and July 30, 2021, not delivering the complaint to the tenant and summoning the tenant to "appear before the justice of the peace to answer the complaint on a date not less than seven nor more than ten days from the date of the summons."

44. These facts are captured on the CCTV footage of the referenced location and are to be proved by reviewing the CCTV footage which shows that circa August 05, 2021, between 2:27 PM and 4:30 PM, Chad June and other officers of the City of Philadelphia working in the Department of Revenue and the Licenses and Inspections section singled out Darron Thomas and:
   a) Claimed that Darron Thomas did not have a Commercial Activity License or any substitute therefor which would allow Darron Thomas to apply for a Rental License or Rental Suitability Certificate.
   b) Claimed that Darron Thomas did not possess a number for the purposes of paying taxes related to property rental.
   c) Claimed that Darron Thomas needed to obtain a number for paying taxes related to property rental afresh
   d) Claimed that there was a problem with Darron Thomas' Social Security Number (SSN)
   e) Failed to accept ID proving Darron Thomas' Identity
   f) Refused to provide documents supporting the claim of a problem with Darron Thomas' SSN
   g) Requested that Darron Thomas produce the title/deed to 87 W Sharpnack Street, Phila PA
   h) Refused to view an electronic copy of the deed for 87 W Sharpnack Street, Phila PA
   i) Summoned multiple security officers to intimidate Darron Thomas
   j) Aided and abetted those security officers in lying about whether or not Darron Thomas arrived at City Hall alone.

45. On August 08, 2021 a police officer singled out Darron Thomas and refused to provide a DC# or to answer any questions posed by Darron Thomas — a video is to be put in evidence as proof.

46. In direct conflict with the Rent Withholding Act, the Philadelphia Ordinances dictate that the landlord cannot collect rent [and the tenant does not have to pay rent into escrow] when the landlord is not in compliance with said Ordinances.

47. In terms of the landlord, the Philadelphia Ordinances forbid what the Rent Withholding Act allows — collecting rent if the landlord fails to possess a Certificate of Rental Suitability, but remedies any breach within six (6) months and obtains a certificate of Rental suitability within that time.

48. In terms of the tenant, the Philadelphia Ordinances allow what the Rent Withholding act prohibits — the non-payment of rent (into escrow) if the Landlord cannot obtain a Rental Suitability certificate within the relevant six (month) period.

49. Within the six month period described in the Rent Withholding Act, instead of having the tenant first use rent due to effect repairs, the Philadelphia Ordinances allow tenants to keep any rent due.

50. Between August 15, 2021 and August 16, 2021, the Police were summoned for a number of reasons, produced DC #s , and claimed:
    a) that they Had no duty to assist with curing vandalism or a nuisance;
    b) that they were not aware of the Police Landlord-Tenant Bulletin #3, or could not provide details of the relevant police directive which should guide their actions in the circumstances, nor were they aware of the Tenant Referral Notice;
    c) On a repeat visit, according to a sergeant, said Bulletin was theirs, but he refused to look at it; and
    d) that they were within their duties to issue a summons/citation to Darron Thomas, and issued said summons/citation under DC# 21-14-042266.

51. Circa August 16, 2021, Officer Edmund responded to a call at 87 W Sharpnack Street, Philadelphia, PA 19119 and issued DC #21-14-042277 in respect of a vandalism complaint where the premises rented by Ashley Banks were inspected and damage to multiple areas of the premises were identified. The garbage stored in the stair way was also acknowledged in the complaint.

# The Philadelphia Ordinances or State Law on Evictions Are Arbitrary, Unreasonable, Unjust and/or not Related to Any Governmental Policy

52. The Philadelphia Ordinances or State Law on Evictions are unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which they employ do not have a real and substantial relation to the objects (right to shelter, opportunity to be heard or avoidance of physical conflict) sought to be attained because:
    f) Where a tenant fails to satisfy the conditions of the Rent Withholding Act under which rent can be withheld;
    g) Where a tenant fails to meet financial hardship conditions, as, for example, set out under regulations promulgated in relation to the CDC ERA Funding;
    h) Where such a tenant does not pay rent;
    i) Where the landlord gives a notice to quit and provides an opportunity for the tenant to find alternate shelter;

j) Where a tenant may agree to move out on a specified date but may renege on that promise within 24 hours, or short notice, of the agreed upon move-out-date

k) Where the court sets a court date 5 weeks or more away from the date an eviction claim is filed;

l) Where it may take two to three weeks after judgment for the Sheriff or eviction officer to remove a tenant against whom judgment for repossession is given;

m) Where the police when called to the scene of a landlord-tenant dispute is not under a duty to ascertain whether the tenant has paid rent, whether the landlord has given notice and an opportunity for the tenant to find alternate shelter, whether the tenant meets the conditions of the Rent Withholding Act, financial hardship requirements similar to those associated with the CDC ERA Funding or to provide proof that the tenant has paid rent; and

n) Where, prior to the sheriff executing a writ of possession, the Police Commissioner and ordinary police officers afford such a tenant to immediately regain possession of the property

53. Landlords are left as sitting ducks, open to any irascible conduct that such a tenant may exude. The unreasonableness is underscored when it is acknowledged that "the tenant's obligation to pay rent and the landlord's obligation imposed by the implied warranty of habitability to provide and maintain habitable premises are mutually dependent. Therefore, a material breach of one of these obligations will relieve the obligation of the other so long as the breach continues. The seeming temporary nature of denying the landlord his/her property rights does not militate against establishing due process rights as "[t]his Court [— the Supreme Court of the U.S. —] has made clear that "temporary or partial impairments to property rights . . . are sufficient to merit due process protection." Doehr, 501 U.S. at 12; see also Fuentes v. Shevin, 407 U.S. 67, 84-85 (1972). ) ("[I]t is now well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment.")."

54. Thus, if a ~~landlord~~ [tenant] breaches his ~~implied warranty of habitability~~ [obligation to pay rent], a ~~tenant~~ [landlord] is relieved of his duty to ~~pay any or all of his rent his~~ [fulfill his implied warranty of habitability or provide a bundle of goods and services, rights and obligations — to provide shelter in exchange for rent]. ~~Nor must the unpaid rent be placed into escrow:~~ Pugh, supra. Accordingly, a ~~tenant~~ [landlord], although relieved of his duty to ~~pay rent~~ [provide shelter in exchange for rent] because of what ~~he perceives to be a breach of the landlord's warranty of habitability~~ [he knows is an objective failure to pay rent], becomes a sitting duck to a ~~self-help eviction for failure to pay his rent~~ [Police Commissioner and police enforced immediate repossession]. In fact, the threat of a ~~self-help eviction~~ [Police Commissioner and police enforced immediate repossession], by making hollow the ~~tenant's right to withhold rent~~ [landlord's constitutional right to protect property and property interests], is the ultimate weapon by which a ~~landlord~~ [tenant] could effectively subvert his obligation to ~~deliver habitable premises~~ [pay rent]."

55. The Covid19 emergency is at the extreme end of when tenants need protection from being deprived of shelter and should therefore be the instant where the least burdens are imposed on vulnerable tenants. In stark contrast, and heightened unreasonable and arbitrary fashion, the requirements outside the Covid19 pandemic are less stringent than the requirements during the Covid19 housing emergency. This is not a coincidence, it is by desire and design. It reflects the city's deliberate effort to oppress private landlords while reserving the ability to protect its own resources. That is, It is arbitrary for the city, where its resources are concerned, to carve out standards such as the financial hardship

requirements, but to have no standards where the resources of private landlords are at stake — see "arbitrary" on pp. 7, 14-15 and 19-20 of *Nixon v The Commonwealth*, especially with reference to Gambone.

56. Since the state or city, by accepting federal funds are not protected by immunity from suit in the circumstances, by having a "law" that protects state resources but not the resources of private landlords, said private landlords are being denied equal protection of the law.

57. In the instant case, the landlord, having provided notice of the non-payment of rent and an opportunity for the tenant to relocate, has no duty to provide habitable premises to the noncompliant tenant because "the tenant's obligation to pay rent and the landlord's obligation imposed by the implied warranty of habitability to provide and maintain habitable premises are, therefore dependent and a material breach of one of these obligations will relieve the obligation of the other so long as the breach continues." Pugh v. Holmes, <u>486 Pa. 272</u>, <u>405 A.2d 897</u> (1979).

58. "The contemporary leasing of residences envisions one person (landlord) exchanging for periodic payments (rent) a bundle of goods and services, rights and obligations. The now classic description of this economic reality appears in Javins v. First National Realty Corp., 138 U.S.App.D.C. 369, 428 F.2d 1071, 1074, cert. denied, 400 U.S. 925, 91 S. Ct. 186, 27 L. Ed. 2d 185 (1970)". Pugh v. Holmes, <u>486 Pa. 272</u>, <u>405 A.2d 897</u> (1979).

59. Notably, section 502 of the Landlord Tenant Act provides:

> "Section 502. Summons and Service. —
> (a) Upon the filing of the complaint, the justice of the peace shall issue a summons which recites substantially the complaint, is directed to any writ server, constable or the sheriff of the county and commands that writ server, constable or sheriff to summon the tenant to appear before the justice of the peace to answer the complaint on a date not less than seven nor more than ten days from the date of the summons."

# Unusual and Unnecessary Conditions for the Purpose

60. Utilities, medicine and food are at least as essential as housing or shelter.

61. Individuals in the society form customer or client relationships with providers of utility services, medical service providers and those who sell or provide food. However, nothing in the relationship between individuals and such providers or the law allows the customer or client who does not want to pay to take the goods or services of such providers, bars said providers from excluding non-paying customers from enjoying the commodities delivered by such providers. Indeed, medical service providers can turn away customers who are financially delinquent. Similarly, after giving proper notice and an opportunity for customers or clients to regularize their accounts, utility service providers can disconnect or discontinue providing service. Finally, regardless of how long a person has been a customer or client, food service providers, such as supermarkets have the right to not serve such customers if said customers or clients refuse to pay for commodities. In fact, if a customer or client, insists on possessing the commodities of a supermarket without paying the police would be called and such a person would be arrested for theft. On the contrary, when a noncompliant

tenant refuses to pay, even if they do so without reason, the Police Commissioner and police are authorized to arrest the landlord [or issue a fine] or allow the tenant (customer) to continue to enjoy the commodity (rented space) that said customer or client has essentially stolen.

62. It may be claimed that many jurisdictions have similar landlord-tenant provisions as does the City of Philadelphia. This is not a bar to declaring such provisions as unusual, unnecessary or out of step with a sense of justice or reality. In the 1970's the implied warranty of habitability replaced a widespread doctrine. Similarly, self-help evictions which were once in vogue were outlawed.

# Claims For Relief

63. The landlord Plaintiff in the instant case seeks equitable relief in the form of declarations stating the claims below; injunctions and preliminary injunctions restraining officers responsible for enforcing the alleged infirmed city or state statutes from enforcing said statutes on the basis of the following enumerated claims:

64. The Plaintiff brings action for breach of his First Amendment Rights to petition the government, in this case the courts, in a timely fashion, such as that provided for in sections 501-504 of the Landlord Tenant Act of 1951.

65. The Plaintiff brings action for breach of the Contracts Clause of the U.S. Constitution; or in respect of the police lending aid to the breach of a contract; where police officers, under the Command of the Police Commissioner, afford "tenants" immediate repossession where the tenancy contract is suitably suspended for breach of a material condition or has been terminated for a total breach or by agreement.

66. The Plaintiff brings action for breach of the superiority of State law over Municipal Ordinances because the Philadelphia Ordinances are void because they contradict the Commonwealth of Pennsylvania's Rent Withholding Act.

67. The landlord Plaintiff in the instant case seeks equitable relief in the form of a declaration that section 9-3901(4)(e) combined with 9-3902, 9-3903 and/or the court officers' actions to omit claims for breach of a material condition and paragraphs II and III of the Plaintiff's Statement of Claim deprives the plaintiff of property without the due process of law and involves a misrepresentation by court officers.

68. The alleged infirmed city or state statutes, in their application to the instant landlord or otherwise, that allows tenants to not pay rent, not prove financial hardship, not meet the conditions for withholding rent under the Rent Withholding Act, not take up alternate accommodation after being given notice and an opportunity to relocate, and retain possession of rented premises violates the due process clause of the U.S. Constitution because it is void for vagueness.

69. The alleged infirmed city or state statutes, in their application to the instant landlord or otherwise, that allows tenants to not pay rent, not prove financial hardship, not meet the conditions for withholding rent under the Rent Withholding Act and retain possession of rented premises violates the due process clause of the U.S. Constitution because they are harsh and oppressive as applied to the landlord/plaintiff in the instant case.

70. The alleged infirmed city or state statutes, in their application to the instant landlord or otherwise, that allows tenants to not pay rent, not prove financial hardship, not meet the

conditions for withholding rent under the Rent Withholding Act, not take up alternate accommodation after being given notice and an opportunity to relocate, and retain possession of rented premises violates the due process clause of the U.S. Constitution because such ordinances and their associated policies are not rationally related to any public policy objective. In the alternative, the alleged infirmed city or state statutes or the Police procedures to facilitate immediate repossession by tenants as described in the last sentence violates the instant landlord's constitutional right to protect property interests because "no rational relationship exists between the classification imposed {in the circumstances described} and a legitimate governmental purpose." Nixon 789 A.2d at 382.

71. Whether the powers to prevent lockouts in the circumstances described have been delegated to police or judges, this is unconstitutional for vagueness because it "impermissibly delegate[] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis." See Grayned v. City of Rockford, 408 U.S. 104, 108–09, 92 S. Ct. 2294, 2299, 33 L. Ed. 2d 222 (1972). Should it be claimed that there is a standard, such as that set out in the police procedures, there is actually no standard because "no rational relationship exists between the [claimed standard imposed in the circumstances described] and a legitimate governmental purpose." That is, the legitimate governmental purpose is to protect vulnerable tenants, but a tenant who is under an obligation to pay, and demonstrates that (s)he can pay, and simply refuses to do so is not a vulnerable tenant.

72. The alleged infirmed city or state statutes, in their application to the instant landlord or otherwise, that allows tenants to not pay rent, not prove financial hardship, not meet the conditions for withholding rent under the Rent Withholding Act, not take up alternate accommodation after being given notice and an opportunity to relocate, and retain possession of rented premises violates the due process clause of the U.S. Constitution because such ordinances and their associated policies are not rationally related to any public policy objective because they are not in the public interest. That is, the extant procedures waste judicial and other government resources.

73. The alleged infirmed city or state statutes, in their application to the instant landlord or otherwise, that allows tenants to not pay rent, not prove financial hardship, not meet the conditions for withholding rent under the Rent Withholding Act, not take up alternate accommodation after being given notice and an opportunity to relocate, and retain possession of rented premises violates the due process clause of the U.S. Constitution because such ordinances and their associated policies are arbitrary or results in absurd practical consequences.

74. The alleged infirmed city or state statutes are unconstitutional, or void, as applied to the instant plaintiff/landlord because those ordinances were transformed from legislative acts to administrative acts when on July 16, 2021 and August 05, 2021 efforts were made to single out said landlord and deny him due process rights under the U.S. constitution — See the Due Process section of Hartman v Acton and Exhibit 110.

75. The alleged infirmed city or state statutes that prevent landlords from executing eviction proceedings in court are void or unconstitutional because they are confiscatory, harsh and/or oppressive.

76. The alleged infirmed city or state statutes, in their application to the instant landlord or otherwise, that prevent landlords from collecting rent for failure to obtain a rental license and/or rental suitability certificate are void or unconstitutional because they are confiscatory, harsh and/or oppressive.

77. Withholding rent without cause, and not being required to show financial hardship, while being able to retain possession of the rented premises for any period of time beyond the

notice period articulated at sections 501-504 of the Landlord Tenant Act of 1951, and possibly time allocated for the police to make a return visit to check on compliance, is alleged to be a "standardless delegation of power to private persons" — noncompliant tenants who simply refuse to pay rent; see *Hartman v Acton*, with reference to *Eubank v Richmond*. As such, the Police Commissioner's actions or police procedures which allow cops to compel landlords to allow tenants to immediately regain possession of rented premises, or to arrest [or issue fines to] landlords who do not allow immediate repossession, in circumstances where tenants do not pay rent, fail to meet the standards for withholding rent under the Rent Withholding Act and do not have to prove financial hardship, is unconstitutional because it is unjust and breaches the due process clause.

78. This action also includes the Plaintiff seeking damages for breach of contract in the amount of $7,630, the rental amount for the remainder of the contract; damage to the property's physical structure in the amount of $3,000; and unpaid rent and fees in the amount of $4,000.

79. The Philadelphia Ordinances are alleged to be infirmed ordinances because they are pre-empted by, or is inconsistent with, Article I(1) and/or Article I(11) of the Pennsylvania Constitution.

80. The existing city ordinance is alleged to be invalid because it does not distinguish between renters who qualify — meet the "competence" standards — for financial hardship relief, or Rent Withholding Act, and those who do not.

## Prayer for Relief

81. Wherefore, the Plaintiff respectfully requests that this Court:

    A. The plaintiff requests that the court order certification of a class for challenging, in the form of declarations and injunctions, the alleged infirmed city or state statutes and Bill No. 200302;

    B. The plaintiff seeks a declaration that PA R. Civ. P. — outlining the overarching purpose of civil litigation — was breached on July 16, 2021 by the attempt to preclude filing of documents, to misrepresent the claims, and to attempt to separate the claim for possession and money judgement and is therefore contempt of court because it tends to impede the proper administration of justice because court officers attempted to violate a rule of court;

    C. Grant both an urgent preliminary/prospective and a permanent injunction enjoining Defendants, its officers, successors, assigns and all persons in active concert or participation with it, from engaging in any practice which retaliates against the plaintiff for bringing this action;

    D. Grant both an urgent preliminary/prospective and a permanent injunction enjoining Defendants, its officers, successors, assigns and all persons in active concert or participation with it, from engaging in any practice which enforces or seeks to enforce, the alleged infirmed city or state statutes;

    E. Grant both an urgent preliminary/prospective and a permanent injunction enjoining Defendants, its officers, successors, assigns and all persons in active concert or participation with it, from engaging in any practice which enforces, or seeks to enforce, the prohibition of late fees as set out under Bill No. 200302;

    F. The plaintiff requests that the court use its "inherent equitable power" to declare the Philadelphia Covid19 ban on late fees regarding payment of rent in landlord-tenant

circumstances void because the local government (or the state) imposed conditions contrary to federal requirements while participating in the federal program which promulgated the CDC ERA Funding;

G. Grant both an urgent preliminary/prospective and a permanent injunction enjoining Ashley Banks and all persons in active concert or participation with her, from entering premises at 87 W Sharpnack Street, Philadelphia PA 19119;

H. Grant both an urgent preliminary/prospective and a permanent injunction enjoining Defendants, its officers, successors, assigns and all persons in active concert or participation with it, from engaging in any practice which prevents Darron Thomas from lawfully obtaining any license relevant to legally renting premises at 87 W Sharpnack Street, Philadelphia PA 19119;

I. Order Ashley Banks to pay all amounts sought, including ongoing charges, in Darron Thomas Municipal Court of Philadelphia claim submitted on July 16, 2021;

J. Order Defendant to institute and carry out policies, practices, and programs which provide standards that eradicate the unjust outcomes — see *Connecticut v. Doehr*, 501 U.S. 1, 14 (1991) (citation omitted). — of leaving landlords as sitting ducks; or to ensure that stipulations of the Police Commissioner or police procedures involve checking whether the requirements of the Rent Withholding Act, financial hardship requirements similar to those associated with programs connected to the CDC ERA Funding, whether notice and an opportunity to relocate have been given, whether rent has been paid, and where the tenant has not met his/her burden, but the landlord has done so, to give an additional 5-10 days for tenant to meet those burdens or be subject to a police enforced lockout, with the option to seek further resolution in court — see *Finberg v Sullivan* quoting *Main Road v. Aytch*, 565 F.2d 54 (3d Cir. 1977) regarding "promulgation of regulations";

K. A declaration that the Philadelphia Ordinances are infirmed ordinances because they are pre-empted by, or is inconsistent with, Article I(1) and/or Article I(11) of the Pennsylvania Constitution.

L. A declaration that his First Amendment Right to petition the government, in this case the courts, in a timely fashion, such as that provided for in sections 501-504 of the Landlord Tenant Act of 1951 was breached.

M. A declaration that there was a breach of the Contracts Clause of the U.S. Constitution; or that the police are lending aid to the breach of a contract; where police officers, under the Command of the Police Commissioner, afford "tenants" immediate repossession where the tenancy contract is suitably suspended for breach of a material condition or has been terminated for a total breach or by agreement.

N. A declaration that that there is a breach of the superiority of State law over Municipal Ordinances because the Philadelphia Ordinances are void because they contradict the Commonwealth of Pennsylvania's Rent Withholding Act.

O. Grant such further relief as the Court deems necessary and proper in the public interest; and

P. Award the Plaintiff his costs in this action.

# JURY TRIAL DEMAND

82. The Plaintiff requests a jury trial on all questions of fact raised by his Complaint.


Dated: August 12, 2021

Respectfully submitted,

DARRON A. THOMAS

Plaintiff


# Preliminary Case Brief and Pleadings

83. These pleadings are to be read as though all previously enumerated paragraphs are explicitly and fully incorporated here. Moreover, all subsequent enumerated items are to be read as part of the allegations that the Plaintiff pleads supporting the Plaintiff's claims.

84. The Plaintiff alleges that having secured a 2-4 Owner Occupied Housing License he was qualified to apply for Rental Licenses and Rental Suitability Certificates without having to reapply or apply separately for a Commercial Activity License.

85. L&I issues 2-4 Unit Owner Occupied Permit/License Numbers and designates them as a substitute for Commercial Activity License Numbers which in turn are substitutes for Rental Licenses (see Exhibit 110), and by disregarding the Plaintiffs SSN, 2-4 Owner Occupied Housing License Number, Tax payer number, or deed when presented, at least in application, the infirmed city or state statutes created an irrebuttable presumption that the Plaintiff is not the owner of 87 W Sharpnack Street, Philadelphia, PA 19119, and also the irrebuttable presumption that he did not meet the requirements to obtain a Rental License or a Rental Suitability certificate.

86. At least in the circumstances of the instant case, the Municipal Court of Philadelphia does not, or did not, acknowledge 2-4 Unit Owner Occupied Permit/License Numbers.

87. There can be no legitimate public policy goal or governmental purpose which requires a specific private landlord to provide shelter to a specific tenant where no rent is paid, said tenant had notice of a breach of the obligation to pay rent and also had an opportunity to find alternative shelter. As applied to the landlord in the instant case, the alleged infirmed city or state statutes clearly, palpably and plainly violates the Constitution.

88. The constitutional question cannot be avoided because the alleged infirmed city or state statute expresses a clear intention because it explicitly prohibits eviction proceedings if said statutes are not satisfied even though L&I issues 2-4 Unit Owner Occupied Permit/License Numbers.

89. The tenant has not met her obligations under any financial hardship ordinances — see the paragraph immediately after note 122 in *HAPCO v Philadelphia*.

90. In the instant case, the non-compliant tenant poses irreparable harm to the Plaintiff's life and property because the non-compliant tenant has already flooded the Plaintiff's property and threatened Plaintiff with the intent to use a deadly weapon, a gun. See notes 131-133 [and associated paragraphs] of HAPCO v Philadelphia. If proceeding via HAPCO, notes 137-138 might negate because not all members may be so harmed. The exception is that all HAPCO members who fall foul of the alleged infirmed city or state statutes would be so harmed.

91. The alleged infirmed city or state statute imposes the enormous — such that they are "harsh and oppressive;" or has a draconian impact — burden of confiscating a landlord's property if the landlord does not comply with said state statute. See *HAPCO v Philadelphia*, at notes 101-102.

92. The alleged infirmed city or state statute promotes physical violence or protracted and unregulated conflict between landlords and tenants, and, as such, demonstrates "the unreasonable, arbitrary and irrational nature of the challenged provisions and establish that no rational relationship exists between the classification imposed upon Petitioners and a legitimate governmental purpose."

93. The alleged infirmed city or state statutes are arbitrary and/or irrational because they infringe on the underlying principle of making self-help evictions illegal. This is so because the alleged infirmed city or state statutes promote physical conflict and/or violence between landlords and tenants and creates irreparable harm because, where landlords are not in compliance, landlords are stripped of the right to proceed in court to evict a non-compliant tenant and self-help evictions are illegal under the Landlord Tenant Act of 1951.

94. It is alleged that, between March 22, 2021 and April 01, 2021, in the tenancy application process, Ashley Banks engaged in misrepresentation and fraud by omitting that she was a tenant at 6055 N NORWOOD STREET PHILADELPHIA, PA 19138 during 2017, and that, she was evicted from said premises for non-payment of rent in 2017 — see Exhibit 103.

95. It is alleged that officers of the City of Philadelphia, including Chad June and other officers on August 05, 2021, engaged in misrepresentation by making claims contrary to the requirements for obtaining a rental license and/or rental suitability certificate.

96. Note 106 [and its associated paragraph] of *HAPCO v Philadelphia* applies equally in respect of landlords' ability or willingness to access benefits of Article 6 of the Constitution — the Supremacy Clause — via due process claims in the event said landlords run afoul of the alleged infirmed city or state statutes. That is, rather than challenge the alleged unconstitutional provision, landlords would rather comply without question. This is for fear of permanently losing their property to a non-compliant tenant whom they can neither self-help-evict nor evict via appropriate court action.

97. The unconstitutionality of the alleged infirmed city or state statutes is a Federal Question "because the penalties for its violation are so enormous — such that they are "harsh and oppressive;" or has a draconian impact — that persons affected thereby are prevented from resorting to the courts for the purpose of determining the validity of the statute."

98. Plaintiff seeks "prospective Injunctive" relief regarding a Statement of Claim and "lease" as presented to the Philadelphia Municipal Courts (10th Floor, 1339 Chesnut Street, Philadelphia, PA 19107) on July 16, 2021 to protect Plaintiff's Due Process Rights and/or Equal Protections Under the Law as provided for under the Fifth and/or Fourteenth Amendment of the U.S. Constitution as follows:

a) to compel court officers to include in Plaintiff's Complaint Plaintiff's averments regarding license under the 2-4 Unit Owner Occupied Activity License.

b) Further or in the alternative, Plaintiff seeks "prospective Injunctive" relief to compel court officers to not misrepresent Plaintiff's license status by omitting Plaintiff's averments II. and III. In the referenced Statement of Claim; and those regarding breach of a material condition of the lease.

c) Allegedly committing contempt of court — like the Minnesota Attorney General in *Ex Parte Young* — by trying to vitiate Plaintiff's rights under Rule 107(b) of the Rules of the Municipal Court of Philadelphia, when court officers asserted that the Plaintiff could not also include claims for money judgement in the Statement of Claim and, when the Plaintiff insisted otherwise, they called police or court security staff to intimidate and threaten the plaintiff.

d) Allegedly committing contempt of court — like the Minnesota Attorney General in *Ex Parte Young* — by violating rule 109(c)(2), 109(c)(3)(f) — condition of the lease breached — and 109(c)(3)(j) — statements regarding appropriate and applicable licensing requirements in the Plaintiff's circumstances — of the Rules of the Municipal Court of Philadelphia by altering the contents of submissions and failing to present those alterations to the plaintiff by exerting the pressure of intimidation by at least four (4) law enforcement personnel.

e) Violated the procedures set out in *Mitchell*, as referenced in *Finberg*, by allowing a court officer, rather than a judge, to effectively erroneously or arbitrarily award possession of the Plaintiff's property to a non-compliant tenant who had threatened the Plaintiff because the court and its officers sought to foreclose an opportunity to the Plaintiff to seek recovery of said property in court, even though the Plaintiff had a license issued by the Department of License and Inspections as appropriate to the Plaintiff's circumstances. Since the Department of License and Inspection is unlikely to issue different license to the Plaintiff unless the Plaintiff falsely represents his property to the Department of License and Inspections the current challenge where the Plaintiff is *"without a chance of redress"* is likely to recur.

f) The failure of the alleged infirmed statute and/or notice of non-compliance issued by the Municipal Court to inform Plaintiff landlords of the efficacy of the 2-4 Unit Owner Occupied Property License/Number is an alleged violation of the due process clause — as found under Section (IV)(B)(2), the "Notice" section (last paragraph before 3) of *Finberg*.

g) Per Page 209 U. S. 159 through Page 209 U. S. 160, by standing as an obstacle to the accomplishment of the objectives and execution of the full purposes of the (superior authority of the) Constitution and/or Congress, the alleged infirmed city or state statutes infringes on the right not to be deprived of property without due process of law — as found under the opening two paragraphs of Section (V) and Section (C)(III) [of the first dissenting opinion, Aldisert — the constitutional question cannot be avoided because the alleged infirmed city or state statutes expresses a clear intention because it explicitly prohibits eviction proceedings in general. The alleged infirmed city or state statutes when not satisfied also has the same prohibitions even though L&I issues 2-4 Unit Owner Occupied Permit/License Numbers and the Municipal Court of Philadelphia seems not to acknowledge said Permit/License Numbers] of *Finberg*. In essence, the effect of the infirmed statute is to foreclose the possibility that Plaintiff landlords can take appropriate court action to resolve a justiciable controversy involving property and/or property interests, and, could deprive said landlords of their property and or rental

payments from said property for a long time. The objective of promoting compliance with rental laws could be achieved by imposing an appropriate fine on non-compliant landlords. Depriving landlords of their property, as described, flagrantly violates the due process clause. That is, the alleged infirmed city or state statute, a state or municipal statute, "is unconstitutional because the penalties for its violation are so enormous — such that they are "harsh and oppressive;" or has a draconian impact —, to a point such that that persons affected thereby are prevented from resorting to the courts for the purpose of determining the controversy regarding their property and/or property interests and are thereby denied the equal protection of the law and their property rendered liable to be taken without due process of law." If another court hhas jurisdiction in such circumstances, the Municipal Court of Philadelphia, as it does with its Noncompliance Notice, ought to, on sua sponte basis, invoke its rule on transferring cases to courts of appropriate jurisdiction. By failing to do so the Municipal Court of Philadelphia prolongs unregulated tenancies, with an increased likelihood of properties which tend toward failing the "fit for human habitation" condition.

99. The operation of the alleged infirmed state statute together with Rule 109(4), in its application, "make the decision of the legislature or of a commission conclusive as to the sufficiency of the [non-$0 rental rates and non-eviction clauses] ~~rates~~, [such that regarding similar laws] this court has held such a law to be unconstitutional. *Chicago, &c. Railway Co. v. Minnesota, supra.* A law which indirectly accomplishes a like result by imposing such conditions upon the right to appeal for judicial relief as work an abandonment of the right, rather than face the conditions upon which it is offered or may be obtained, is also unconstitutional. It may therefore be said that, when the penalties for disobedience are by [punishment] ~~fines so enormous~~ — such that they are "harsh and oppressive;" or has a draconian impact — and ~~imprisonment~~ so severe as to intimidate [landlords, their agents, or representatives] ~~the company and its officers~~ from resorting to the courts to test the validity of the legislation, the result is the same as if the law, in terms, prohibited [landlords, their agents, or representatives] ~~the company~~ from seeking judicial construction of laws which deeply affect its rights."

100.        The Plaintiff alleges that there is a class of landlords who are similarly affected and should be able to join in a class action to enforce the constitutional rights raised in theses submissions. See section (VI) of *__Finberg__* regarding certification for a class of plaintiffs affected by the infirmed statute.

101.        PA R. Civ. P. — outlining the overarching purpose of civil litigation — was allegedly breached by the attempt to preclude filing of documents, to misrepresent the claims, and to attempt to separate the claim for possession and money judgement and is therefore contempt of court because it tends to impede the proper administration of justice because court officers attempted to violate a rule of court.

The Tenant to Landlord Ratio is Less than 3 in 2-4 Unit Owner Occupied Situations

102.        In the circumstances of 2-4 Unit Owner Occupied housing there is not a sufficiently large number of tenants compared to landlords to justify the complete decimation of the rights of landlords to serve some claimed public interest to the benefit of tenants. Specifically, there is no public interest to protect where tenants deliberately fail to pay rent while not having the burden of proving that they are experiencing financial hardship in a

manner similar to the requirements associated with the CDC ERA Funding — see *Miller v Schoene*.

103.    It is to be noted that where an act fails to distinguish between those that are "competent" and those that are not competent to meet a particular standard, the act is invalid. The compelling judicial authority on this subject is that " ... an act making it a misdemeanor for a person to act as a railway passenger conductor without having had two years' experience as a freight conductor or brakeman was invalidated as not rationally distinguishing between those competent and those not competent to serve as conductor.274" (https://law.justia.com/constitution/us/amendment-14/04-due-process-of-law.html)

The Infirmed Ordinances Amount to a Taking of Private Property for a Private Benefit

104.    Where landlords are required to continue to provide housing to tenants who refuse to pay and who have not met any of the legal requirements similar to the CDC ERA Funding financial hardship requirements or the Rent Withholding Act requirements and the timelines set out in sections 502-504 of the Landlord Tenant Act of 1951 it is the taking of private property for private benefit to which the following judicial dicta applies equally " [o]n the other hand, where the evidence showed that an order prorating allowed production among several wells was actually intended to compel pipeline owners to furnish a market to those who had no pipeline connections, the order was held void as a taking of private property for private benefit.292 Furthermore, in respect of the breach of the timelines set out under sections 501-502 of the Landlord Tenant Act of 1951, "[t]he State cannot declare that the emergency is over, on the one hand, and continue to use that same "emergency" to justify the ongoing implementation of a law that infringes upon its citizens' constitutional rights, on the other. The asserted State interest has therefore "expired according to its own terms." *Roman Catholic Diocese*, 141 S. Ct. at 70 (Gorsuch, J., concurring)." In the instant case the Plaintiff landlord's first amendment right to petition [the courts], and due process rights to be heard in a meaningful manner and at a reasonable time, have been vitiated by the breach of the timelines under sections 502-504 of the Landlord Tenant Act of 1951 ""[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," Roman Catholic Diocese, 141 S. Ct. at 67 (citation omitted), and the same typically holds true for the deprivation of other constitutional rights, see 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2013); see also, e.g., Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir. 1996); but see Brown v. Sec'y, U.S. Dep't of Health & Human Servs., 2021 WL 2944379, at *3-6 (11th Cir. July 14, 2021) (rejecting arguments for a per se rule and finding a "lack of evidence" establishing irreparable harm in that case challenging the legality of the CDC's more limited national moratorium)."

105.    This is an on-point case balancing private interests — raises some concerns. The crux of the argument is that, the state or city is acting "unreasonably" by not requiring that "financially vulnerable tenants" engage hardship procedures to avoid lockouts enforced by the police because this would not be "permitting serious injury to a public interest". By setting up hardship requirements for vulnerable tenants, and, in a lock-out, allowing the police to determine whether tenants have paid rent or engaged the hardship procedures,

and, where a tenant had not paid rent or engaged hardship procedures, the police would enforce a lock-out because it advances the same public interest that the extant state of affairs call upon to outlaw self-help evictions. The discretion and investigative powers afforded the police here would be similar to those given to the entomologist in *Miller v Schoene*. Such discretion and hardship procedures would not be such that, while conferring the power on [tenants] to virtually control and dispose of the property rights of others [in this case, landlords]," it "creates no standard by which the power thus given [to tenants facing financial hardship and the police] is to be exercised; in other words, [noncompliant tenants — together with the police] who have the authority to [maintain possession] may do so solely for their own interests, or even capriciously. Furthermore, withholding rent without cause contradicts the purpose of the Rent Withholding Act — see *Depaul v. Kauffman* Pa., 272 A.2d, 500 (1971). Once police enforcement of possession to a noncompliant tenant informs such a tenant that (s)he does not need to comply with such as fundamental a clause as paying rent, with no burden to prove hardship, such a tenant may deduce that (s)he can violate any condition of the rental agreement without consequence. The result is that various tenants may choose to pay some different portion of rent or none at all. Different tenants may also choose to abide by different clauses of rental agreements. "It is hard to understand how public comfort or convenience, much less public health, can be promoted by a line which may be so variously disposed." In fact, ""[f]airness can rarely be obtained" through this sort of "secret, one-sided determination of facts decisive of rights." *Connecticut v. Doehr*, 501 U.S. 1, 14 (1991) (citation omitted).

106.     Effectively, a tenant who fails to pay rent or engage hardship procedures has relinquished any property interests that had been acquired under a rental agreement. As it stands, "the property of plaintiff [landlords] in error is [not] subjected to the possibly arbitrary and irresponsible action of a group of private citizens.

107.     In *Eubanks v Richmond* the court stated:

"A municipal ordinance requiring the authorities to establish building lines on separate blocks back of the public streets and across private property on the request of less than all of the owners of the property affected is not a valid exercise of police power, nor does it serve the public safety, convenience, or welfare.

Such an ordinance takes private property, not for public welfare but for convenience of other owners of property, and deprives the person whose property is taken of his property without due process of law and is unconstitutional under the Fourteenth Amendment.

The ordinance of the City of Richmond based on Chapter 349 of the Laws of Virginia of 1908, requiring the municipal authorities to establish building lines in any block on request of the owners of two-thirds of the property, is unconstitutional as an attempt to deprive nonassenting owners of their property without due process of law."

108.     Similarly, an ordinance allowing noncompliant tenants, who simply refuse to pay rent, to continue to occupy "rented" premises, with the assistance of the police, is not a valid use of the police power, nor does it serve the public safety, convenience or welfare".

This is so because it creates unregulated occupancy by noncompliant tenants, who, by not paying rent or engaging hardship procedures, have announced that they do not intend to act in accordance with the tenancy agreement or established law.

109.    It is alleged that the City of Philadelphia is deliberately vague in the requirements imposed on tenants who do not pay rent and wish to retain possession of rented premises because no conditions that tenants must meet are set out in the police procedures for granting tenants the right of immediate repossession — see *Miller v Schoene* at the sentence/paragraph sandwiched by footnotes 10 and 11.

The Philadelphia Covid19 Ban on Rent Late Fees Is Void

110.    The plaintiff requests that the court use its "inherent equitable power" to declare the Philadelphia Covid19 ban on late fees regarding payment of rent in landlord-tenant circumstances void because the local government (or the state) imposed conditions contrary to federal requirements while participating in the federal program which promulgated the CDC ERA Funding. The expressed settled law on this subject is documented as follows: https://www.law.cornell.edu/constitution-conan/article-6/clause-2

"When Congress legislates pursuant to its delegated powers, conflicting state law and policy must yield.[8] Although the preemptive effect of federal legislation is best known in areas governed by the Commerce Clause, the same effect is present, of course, whenever Congress legislates pursuant to one of its enumerated powers. The Supremacy Clause operates whether the authority of Congress is express or implied, and whether plenary or dependent upon state acceptance. The latter may be seen in a series of cases concerning the validity of state legislation enacted to bring the states within the various programs authorized by Congress pursuant to the Social Security Act.[9] State participation in the programs is voluntary, technically speaking, and no state is compelled to enact legislation comporting with the requirements of federal law. Once a state is participating, however, any of its legislation that is contrary to federal requirements is void under the Supremacy Clause.[10]"

"At the same time, however, the Supremacy Clause is not the "source of any federal rights,"[11] and the Clause "certainly does not create a cause of action."[12] As such, individual litigants cannot sue to enforce federal law through the Supremacy Clause, as such a reading of the Clause would prevent Congress from limiting enforcement of federal laws to federal actors.[13] Instead, without a statutory cause of action, those wishing to seek injunctive relief against a state actor that refuses to comply with federal law must rely on the inherent equitable power of courts, a judge-made remedy that may be overridden by Congress.[14]"

...

"A claim that Congress acted on incomplete information will not suffice, the Court noting that South Carolina had "not even alleged that it was deprived of any right to participate in the national political process or that it was singled out in a way that left it politically isolated and powerless."**71**"

# Preliminary Memorandum of Law For Urgent Injunction or TRO

111.    The Plaintiff seeks to make oral arguments for urgent injunctions to maintain the status quo as outlined below. "In *Gambone v. Commonwealth*, 375 Pa. 547, 101 A.2d 634, this Court, speaking through Mr. Chief Justice STERN, said, p. 551, citing many cases in a footnote in support of the text: ". . . By a host of authorities, Federal and State alike, it has been held that a law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained. Under the guise of protecting the public interests the legislature may not arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations. The question whether any particular statutory provision is so related to the public good and so reasonable in the means it prescribes as to justify the exercise of the police power, is one for the judgment, in the first instance, of the law-making branch of the government, but its final determination is for the courts."." *Warren v Philadelphia* 1956.

# Legal Standard For An Urgent Preliminary Injunction

112.    "[A]n injunction is 'an extraordinary remedy, which should be granted only in limited circumstances.'" "The moving party must establish four factors to get a preliminary injunction: (1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) that the public interest weighs in favor of granting the injunction." "[A] movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Hapco v Philadelphia*.

### Likelihood of Success and Irreparable Harm to the Plaintiff

*The Late Fee Prohibition Issue*

113.    Exhibit 104 leaves no doubt that the City of Philadelphia has received money from, and is participating in, the Federal CDC ERA Funding programs. There is also no doubt that the City of Philadelphia prohibits late fees as discussed in *Hapco v Philadelphia* at footnote 80 as follows:

"The only part of the EHPA that permanently forecloses landlords from obtaining their bargained for contractual remedies is the provision that waives late fees and interest for residential tenants who have experienced a COVID-19 financial hardship and submit a certification of hardship to their landlord."

114.     Furthermore, the clear standards of the Federal CDC ERA Funding programs as it relates to financial hardship are as follows: (https://www.equalhousing.org/updated-information-on-covid-19-and-eviction-protections-for-renters/):

"**UPDATE:** The Center for Disease Control has issued a federal eviction moratorium that has been extended until July 31st. The moratorium applies only to non-payment of rent, and does not forgive rent or prohibit landlords or property owners from charging late fees. In order to qualify for the eviction protection, the tenant will need to sign a <u>declaration</u> certifying that the following are true:

- I have used best efforts to obtain all available government assistance for rent or housing;

- I either expect to earn no more than $99,000 in annual income for Calendar Year 2020-2021(or no more than $198,000 if filing a joint tax return), was not required to report any income in 2020 to the U.S. Internal Revenue Service, or received an Economic Impact Payment (stimulus check) pursuant to Section 2201 of the CARES Act;

- I am unable to pay my full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, lay-offs, or extraordinary out-of-pocket medical expenses;

- I am using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses;

- If evicted I would likely become homeless, need to move into a homeless shelter, or need to move into a new residence shared by other people who live in close quarters because I have no other available housing options;

- I understand that I must still pay rent or make a housing payment and comply with other obligations that I may have under my tenancy, lease agreement, or similar contract. *I further understand that fees, penalties, or interest for not paying rent or making a housing payment on time as required by my tenancy, lease agreement, or similar contract may still be charged or collected.*

- I further understand that at the end of this temporary halt on evictions on March 31, 2021, my housing provider may require payment in full for all payments not made prior to and during the temporary halt and failure to pay may make me subject to eviction pursuant to state and local laws"

115.     It is also well settled law that the court has the inherent equitable power to grant remedy "[w]hen Congress legislates pursuant to its delegated powers, conflicting state law and policy must yield.8 Although the preemptive effect of federal legislation is best known in areas governed by the Commerce Clause, the same effect is present, of course, whenever Congress legislates pursuant to one of its enumerated powers. The Supremacy Clause operates whether the authority of Congress is express or implied, and whether plenary or dependent upon state acceptance. The latter may be seen in a series of cases concerning the validity of state legislation enacted to bring the states within the various programs authorized by Congress pursuant to the Social Security Act.9 State participation in the programs is voluntary, technically speaking, and no state is compelled to enact legislation comporting with the requirements of federal law. Once a state is participating, however, any of its legislation that is contrary to federal requirements is void under the Supremacy Clause.10"

116.     Furthermore, there is a high likelihood of success where the Plaintiff now seeks a declaration that Section 9-3901(4)(e) [and/or combined with 9-3902 and/or 9-3903] is invalid, under the supremacy clause of Article six(6) of the Constitution, because it conflicts with the Commonwealth of Pennsylvania's Rent Withholding Act. These alleged infirmed ordinances are also pre-empted by, or is inconsistent with, Article I(1) and/or Article I(11) of the Pennsylvania Constitution — also see PA R. Civ. P. 128(c) — and/or the Fifth and/or Fourteenth Amendment of the U.S. Constitution in so far as the alleged infirmed statute breaches the Plaintiff's right to acquire, possess, protect and/or defend property and/or property interests; and not to be deprived of said property without due process of law. That is, the alleged infirmed city or state statutes seeks to give possession of the property of landlords to non-complying (former) tenants or squatters while depriving the landlord of the right to seek to evict such tenants or to charge rental rates above $0. This is so because, at least in its application as demonstrated by the facts in the instant case, the infirmed city or state statute bars court action by the landlord to recover possession, and to collect rent; the police are under a duty to allow "tenants" to immediately regain possession; and sections 502-504 of the Landlord Tenant Act of 1951, together with judicial development as outlined in *Wofford v Vavreck*, bars self-help evictions such that the effect of the infirmed state statute is confiscatory and, therefore, invalid and/or unconstitutional— see *Ex parte Young*, 209 U.S. 123 (1908), Page 209 U. S. 147 of . Together, the last two bars foreclose a landlord's rights to acquire, possess, protect and/or defend property and/or property interests.

117.     In sum, the alleged infirmed city or state statutes are arbitrary and/or irrational because they infringe on the underlying principle of making self-help evictions illegal. This is so because the alleged infirmed city or state statutes promote physical conflict and/or violence between landlords and tenants and create irreparable harm because, where landlords are not in compliance, and as in the instant case officers of the city create obstacles to obtain licenses beyond the legislated rules, landlords are stripped of the right to proceed in court to evict a non-compliant tenant and self-help evictions are illegal under the Landlord Tenant Act of 1951.

*Success – The Philadelphia Ordinances Are Void Due To Inconsistency With The Rent Withholding Act*
The Plaintiffs probability of success as it relates to inconsistency between the Rent Withholding Act and the Philadelphia Ordinances is high because the ordinances prohibit what the Rent Withholding Act permits, and permits what the Rent Withholding Act prohibits. The Rent Withholding Act

essentially provides that where a landlord does not have a license, and that lack of a license is curable, the landlord can collect rent, provided [rent is paid into escrow and] the landlord cures the lack of a license within six months.

On the contrary, Philadelphia Ordinances 9-3901, 9-3902 and/or 9-3903 combine to provide that where a landlord does not have a license, regardless of whether the landlord cures the lack of a license, the landlord cannot collect rent for the period for which there was no license.

That is, the Philadelphia ordinances prohibit what the Rent Withholding Act allows. As such, the Philadelphia ordinances are void.

Alternatively, the Philadelphia Ordinances — 9-1601, 9-1602, 9-1603, 9-1604, 9-1605, 9-3901, 9-3902 and/or 9-3903 — require tenants to violate the Rent Withholding Act by not paying rent [into escrow] whenever a tenant chooses [or claims reason] not to pay rent and continues to occupy the property when a landlord does not have a current license. This becomes clear when the following excerpt from *Depaul v. Kauffman* Pa., 272 A.2d, 500 (1971) is considered in its plain language:

> "The Rent Withholding Act states expressly that "[d]uring any period when the duty to pay rent is suspended, and the tenant continues to occupy the dwelling, the rent withheld *shall be deposited* by the tenant in an escrow account . . ." (emphasis added.) *This language makes clear that a tenant may in no event remain in possession without paying the required rent to the escrowee.* [my emphasis] See also *National Council v. Roberson,* 214 Pa. Super. 9, 248 A.2d 861 (1969) (majority and concurring opinions)."

The last excerpt also shows that where the tenant does not deposit rents due into escrow, said tenant is subject to eviction. However, the Philadelphia Ordinances preclude evictions in these circumstances. Furthermore, the foregoing highlights the standardless or unreasonable nature of the Philadelphia Ordinances, especially because the police make no attempt to, and are apparently under no duty to, enforce Codes 9-804(1)(a) and/or 9-804(12)(e)(.3). That is, a tenant who is not "lawfully" occupying the premises is granted immediate repossession by the police under the Philadelphia Ordinances. The court delays experienced by the landlord in the instant case clearly elucidates why a condition or standard similar to 9-1601(10) should exist to protect landlords, and why said standard should be enforced with a police lockout in the circumstances of the instant landlord.

In these circumstances, there is no claim that law making has been delegated. However, in respect of the Police's lack of attention to the standards of Codes 9-804(1)(a) and/or 9-804(12)(e)(.3), the following quote from *Depaul v. Kauffman* Pa., 272 A.2d, 500 (1971) applies:

> "While the legislature cannot delegate power to make a law, it may, where necessary, confer authority and discretion in connection with the execution of the law; it may establish primary standards and impose upon others the duty to carry out the declared legislative policy in accordance with the general provisions of the act.' . . . However, legislation must contain adequate standards *392 which will guide and restrain the exercise of the delegated administrative functions. . . ." *Chartiers Valley Joint Schools v. Allegheny Bd. of School Directors,* 418 Pa. 520, 529-30, 211 A.2d 487, 492-93 (1965) (citations omitted)."

If there are standards, they neither guide nor restrain the police, officers of the Department of License and Inspections, nor officers of the Municipal court of Philadelphia.

In respect of the Rent Withholding Act, an alternative way to view how the Philadelphia Ordinances contradict the former is to examine the conditions of each of these pieces of legislation. Firstly, in

terms of requirements placed on landlords, the Rent Withholding Act constitutes two conditions, one administrative or procedural, and the other substantive. These conditions are:

a) Administrative or Procedural: Obtaining and/or Maintaining Licenses and Suitability Certificate; and
b) Substantive: Maintaining premises ""fit for human habitation""

If the administrative condition cannot be met because the relevant licenses are suspended or cannot be renewed — obtained afresh — because the premises are deemed "unfit for human habitation," the landlord may correct the problem within six months and still be able to collect rent.

On the other hand, in terms of Rental License and Suitability Certificates, the Philadelphia Ordinances speak to only the administrative or procedural condition of the Rent Withholding Act. That is, a landlord whose property may be perfectly "fit for human habitation" may not have a current Rental License or Suitability certificate. In direct conflict with the Rent Withholding Act, the Philadelphia Ordinances dictate that the landlord cannot collect rent [and the tenant does not have to pay rent into escrow]. In terms of the landlord the Philadelphia Ordinances forbid what the Rent Withholding Act allows, and in terms of the tenant, the Philadelphia Ordinances allow what the Rent Withholding act prohibits.

*Success - Irrationality of Philadelphia Ordinances Ala the Rent Withholding Act*
Furthermore, the Philadelphia Ordinances juxtaposed with the Rent Withholding Act are demonstrably not rationally related to any governmental purpose or objective. The licensing requirements are supposedly about providing housing "fit for human habitation". The same is true of the Rent Withholding Act. The Rent Withholding Act achieves this purpose by setting incentives for the landlord, having been alleged or found to be in breach, to bring housing into the ""fit for human habitation" condition within six (6) months; or for the tenant to use monies held in escrow to restore housing to the ""fit for human habitation." On the contrary, the Philadelphia Ordinances provide no such guide for bringing housing in compliance with the ""fit for human habitation" condition. This is so because the Philadelphia Ordinances preclude any payment or receipt of rent, and further create an unregulated tenancy by foreclosing evictions — see *Frempong v Richardson*. That is, where a landlord's property is occupied by a tenant who cannot be evicted and who does not pay rent, such a landlord is unlikely to effect any repairs while such conditions persist. Moreover, a tenant relieved from rent paying obligations [and who cannot be evicted], and who is under no obligation to repair the property, is unlikely to carry out any repairs. In sum, the Philadelphia ordinances make it less likely that properties which breach the fit for human habitation" condition will be speedily brought back into conformity.

The Status Quo
In the case against Ashley Banks, the status quo prior to her fraudulently obtaining possession of the premises by not disclosing the address from which she was evicted, was that Darron Thomas had unfettered access to the 3rd Floor at 87 W Sharpnack Street, Philadelphia PA 19119, and granting a preliminary injunction would only maintain the status quo and prevent irreparable harm or gross injustice. Moreover, before Ashley Banks' illegal or unlawful acts, the status quo is that Darron Thomas' property is fit for human habitation. However, at the rate Ashley Banks is going, changing locks, keeping garbage in the stair way, and not taking said garbage out on trash day, destroying locks and other parts of the structure, Darron Thomas will suffer irreparable harm because Ashley Banks has demonstrated that she is either unwilling or unable to meet her financial obligations. That is, a financial judgement against her is likely to remain unsatisfied. If the other defendants are allowed to enforce the Philadelphia Ordinances Ashley Banks will be allowed to destroy and/or

further misuse Darron Thomas' property, thereby vitiating the status quo. The supporting case law is quoted within *Frempong v Richardson* as:

> "See Ambrogi v. Reber, 932 A.2d 969, 974 (Pa. Super. 2007) ("The purpose of a preliminary injunction is to prevent irreparable injury or gross injustice by preserving the status quo as it exists or as it previously existed before the acts complained of in the complaint."). Landlords do not explain what the "status quo" was; if they are arguing that the "status quo" was their having unfettered access into the property while it was leased by Tenants, Landlords have not cited any legal authority supporting such a claim."

*The 9-3901(4)(e) and Associated Sections Remain Live*

> "Our state appellate courts have consistently held that when "applying [the] normal rules of statutory construction, [the] presence of disjunctive word 'or' in [a] statute indicates that elements of statute are met when any particular element is satisfied, regardless of whether other elements are also met." See Wagner v. Wagner, 887 A.2d 282, 286 (Pa. Super. 2005). See also Ben. Consumer Disc. Co. v. Vukman, 77 A.3d 547, 555 (Pa. 2013).

> As stated above, the trial court in this case found that "the plain language of [Subsection § 9-3901(4)(e)] denies a non-compliant owner either the right to possession or the right to collect rent." Trial Court Opinion, 11/2/18, at 14. It thus found that awarding possession of the property to Landlords, where unpaid rent was not awarded, was proper. After careful review, we disagree, and conclude that under Section 9-3901(4)(e), Landlords were prohibited from recovering rent as well as possession of the property.

> ...

> Phila. Code § 9-3901(4)(e) (emphasis added). We acknowledge that the word "or" generally connotes a disjunction.8 However, we emphasize that the statue is written in the passive voice ("shall be denied") and in reading the entire context of the statute, we interpret Section 9-3901(4)(e) to mean that a noncompliant owner may not recover possession "or" collect rent, meaning he cannot receive either."

*Ambrogi v Reber Standard for Preliminary Injunction*
In **Ambrogi** with reference to **Walter**, the court stated:

> "¶ 15 A preliminary injunction's purpose is to preserve the status quo and to prevent imminent and irreparable harm that might occur before the merits of a case can be heard and determined. Walter, 837 A.2d at 1209. A plaintiff seeking an injunction must establish that: 1) relief is necessary to prevent immediate and irreparable harm; 2) a greater injury will occur from refusing the injunction than from granting it; 3) the injunction will restore the parties to the status quo; 4) the alleged wrong is manifest and the injunction is reasonably suited to abate it; and 5) the plaintiff's right to relief is clear."

**Ambrogi**, at "¶ 17 - ¶ 31, further demonstrates that there are substantial legal questions, at least of fraudulently establishing tenancy, exists such that where judgment is likely not to be satisfied this constitutes irreparable harm. In the instant case concerning Ashley Banks, she has demonstrated that even when she knows she has a monetary obligation, and she has the finances to satisfy that obligation, she will refuse to satisfy that obligation, as she has done with the outstanding rent in this

case because she has never provided any reason for not paying. Instead, on multiple occasions, she has feigned payment, as evinced by the rent payment failure notices from Zillow. Furthermore, the instant case is one where Plaintiff landlords "seek an injunction against the misuse of his property." — see *Depaul v. Kauffman* Pa., 272 A.2d, 500 (1971).

Harm to Others

118.      The parties that would be affected by any granted injunction are Ashley Banks, similarly situated non-compliant tenants, then named city officials and any other city official that seeks to enforce the alleged infirmed city or state statutes.

*Officers at City Hall and Transcribing Court Officers Acted Illegally and Suffer No Harm*

119.      Where the alleged infirmed city or state statutes are found to be void or unconstitutional "In our view, there is no interference with his discretion under the facts herein. There is no doubt that the court cannot control the exercise of the discretion of an officer. It can only direct affirmative action where the officer having some duty to perform not involving discretion, but merely ministerial in its nature, refuses or neglects to take such action. In that case, the court can direct the defendant to perform this merely ministerial duty. *Board of Liquidation v. McComb*, 92 U. S. 531, 92 U. S. 541.

Page 209 U. S. 159

120.      The general discretion regarding the enforcement of the laws when and as he deems appropriate is not interfered with by an injunction which restrains the state officer from taking any steps towards the enforcement of an unconstitutional enactment, to the injury of complainant. In such case, no affirmative action of any nature is directed, and the officer is simply prohibited from doing an act which he had no legal right to do. An injunction to prevent him from doing that which he has no legal right to do is not an interference with the discretion of an officer."

121.      Furthermore, should landlords who have not been able to collect late fees choose to pursue the city or individual tenants for late fees, The city itself and such tenants may suffer a financial loss. Financial losses are clearly not irreparable. Furthermore, any financial judgment against the city or tenants who were prohibited from paying late fees would simply be the result of righting the wrong brought about by the city breaching the supremacy clause by prohibiting late fees while participating in a federal program that allowed late fees.

*The CDC ERA Funding Requirements and the Rent Withholding Act Implies No Harm to Affected Tenants*

122.      Ashley Banks and similarly situated tenants would suffer no harm beyond the CDC ERA Funding requirements and the Rent Withholding Act. They would only be dispossessed of property under the supervision of the police and they would be allowed their day in court. Before the police dispossesses them of property, they would have an opportunity to demonstrate that the landlord did not give them notice of non-payment and an opportunity to relocate; they would have an opportunity to demonstrate that they meet financial hardship requirements similar to those under the CDC ERA Funding; or that they satisfy the conditions for withholding rent as provided for under the Rent Withholding Act.

The Public Interest

123.     The public interest is best served when court or judicial resources are used efficiently, and justiciable controversies are resolved expeditiously in accordance with law. Since the police have already been given power to investigate and decide possession in landlord-tenant disputes, the police could continue to perform this function but with standards connected to the Rent Withholding Act and requirements similar to financial hardship requirements associated with the CDC ERA Funding. This is standard law enforcement activity. That is, if the police are called in a case of alleged theft, should the supposed thieve not be able to produce a receipt but the store owner can show proof of ownership of the goods the police dispossess the thief of the goods and may even arrest such a thief. Similarly, when a tenant decides not to pay rent without cause, is notified of the default and given an opportunity to relocate, such a tenant by insisting on not paying rent and retaining possession of the rented premises is stealing a commodity and should be dispossessed by the police. Of course, such a tenant should have an opportunity to be heard in court at a later date. However, where a tenant clearly knows that (s)he has not paid rent, does not meet the requirements of the Rent Withholding Act, or requirements similar to the financial hardship requirements associated with the CDC ERA Funding, such a tenant is unlikely to commence court action. In contrast, a landlord dispossessed of his/her property by a non-paying tenant (with the assistance of the police) would almost always commence court action, or worse yet resort to violence. Neither of these actions by the landlord are in the public interest because they either clog the courts or result in physical violence.

124.     Furthermore, the alleged infirmed city or state statute promotes physical violence or protracted and unregulated conflict between landlords and tenants, and, as such, harms the public interests and demonstrates "the unreasonable, arbitrary and irrational nature of the challenged provisions and establish that no rational relationship exists between the classification imposed upon Petitioners and a legitimate governmental purpose."

# The Constitution is Federal Law

125.     "State courts are bound then to give effect to federal law when it is applicable and to disregard state law when there is a conflict; federal law includes, of course, not only the Constitution and laws and treaties but also the interpretations of their meanings by the United States Supreme Court.24"

# Relationship With the Landlord Tenant Act of 1951

WOFFORD v. VAVRECK | 22 Pa. D. & C. 3d 444 (1981) | pc3d4441394 | Leagle.com

126.     "plaintiffs point to the "General repeal" found in section 250.602 of the Landlord Tenant Act of 1951 which states that: "All other acts and parts of acts, general, local and special, inconsistent with or supplied by this act, are hereby repealed. *It is intended that this act shall furnish a complete and exclusive system in itself.*" (Emphasis supplied.)"

...

127.      "There are numerous reasons why self-help evictions for nonpayment of rent should be abandoned. Obviously, the use of self-help increases the potential of violent confrontations between landlord and tenant. It is also less orderly than a proceeding at law and affords the tenants essentially no rights. Because self-help involves the taking of property (deprivation of shelter) without affording a tenant notice and an opportunity to present defenses or to otherwise be heard, it involves an arguable violation of due process: Fuentes v. Shevin, 407 U.S. 67 (1972)."

The Judiciary Has Held That "Congresses" Intention Prohibits Self-help

128.      "the abandonment of the self-help eviction is but a natural judicial extension of the well settled doctrine that a forfeiture of a leasehold is odious and must be strictly construed: Elizabethtown Lodge No. 596 v. Ellis, 391 Pa. 19, 137 A.2d 286 (1958). By forbidding a private self-help repossession following a real or imagined forfeiture, and instead requiring a landlord to proceed by legal process, the judicial obligation to examine that forfeiture with close scrutiny is best served."

Flies in the Face of the Goal of Civilized Relations Between Landlord and Tenant

129.      "Finally, if not abandoned, self-help evictions would seriously undermine the protection inherent in the newly recognized implied warranty of habitability applicable to all residential leases: Pugh, supra [Pugh v. Holmes, 486 Pa. 272, 405 A.2d 897 (1979).]. In Pugh, our Supreme Court held that the covenants and warranties in such a lease are mutually dependent; the tenant's obligation to pay rent and the landlord's obligation imposed by the implied warranty of habitability to provide and maintain habitable premises are, therefore dependent and a material breach of one of these obligations will relieve the obligation of the other so long as the breach continues.

130.      Thus, if a landlord breaches his implied warranty of habitability, a tenant is relieved of his duty to pay any or all of his rent. Nor must the unpaid rent be placed into escrow: Pugh, supra. Accordingly, a tenant, although relieved of his duty to pay rent because of what he perceives to be a breach of the landlord's warranty of habitability, becomes a sitting duck to a self-help eviction for failure to pay his rent. In fact, the threat of a self-help eviction, by making hollow the tenant's right to withhold rent, is the ultimate weapon by which a landlord could effectively subvert his obligation to deliver habitable premises."

...

131.      "Finally, in Morrison v. Brungard, (Lycoming Co. 1974), the court in enjoining a landlord from locking out the tenant for nonpayment of rent noted that:

". . . [T]he Landlord Tenant Act of 1951 and the related Rules of Procedure for Justice of the Peace Court provides the exclusive process for a recovery of possession of real estate for rental arrears. The procedure outlined in the Act provides the Landlord with a reasonable means of evicting tenants who fail to make rent payments while at the same time furnishing the tenant, through proper notice, with reasonable time in which to relocate. To permit self-help would ignore the obvious legislative intent to permit a tenant, allegedly in arrears in his rent, fifteen days to relocate during the warmer months and thirty days during the colder months."

If the void left by the abolishment of self-help cannot be adequately and effectively filled by the 1951 act, as amended, and the related rules of procedure, then any

resulting unfair advantage to either landlord or tenant must be remedied by legislative correction."

132.    By enforcing the alleged infirmed city or state statutes, or failing to abide by the timelines set out in sections 502-504 of the Landlord Tenant Act of 1951, the court is subverting its obligation to administer justice or exercise jurisdiction in the presence of a justiciable controversy over which the court has jurisdiction.

Why the City Ordinances Relieving Tenants of All Burdens Are Arbitrary

133.    Pursuant to voluntarily participating in the CDC ERA Funding and adopting the financial hardship proof standards under said Act, the city of Philadelphia has accepted that a rational way to pursue any objective set out in, or connected to, the CDC ERA Funding is to require tenants to prove financial hardship under penalty of perjury. "Strict scrutiny applies and, as in the *Roman Catholic Diocese* case, the [city or] State cannot carry its burden of proving that the law is narrowly tailored to a compelling government interest. Indeed, there are numerous less restrictive alternatives—including the government itself [promulgating regulations like the ones sought to be ordered, housing the type pf tenants described herein that the government seeks to protect; and/or] circulating and publishing this message, declaration form, and legal service provider list—that "would communicate the desired information to the public without burdening [Applicants] with unwanted speech." *Riley v. Nat'l Fed'n of the Blind of N.C.*, Inc., 487 U.S. 781, 800 (1988)." The City of Philadelphia's ordinances relieving noncompliant tenants — those who simply refuse to pay rent — of all burdens to demonstrate financial hardship or meet the standards for withholding rent under the Rent Withholding Act are unreasonable or arbitrary because:

a)    The city has accepted the terms of, or are under on obligation to adhere to, the Rent Withholding Act.

b)    The city's ordinance does not require certain noncompliant tenants to show continued property interests by paying rent, engaging the Rent Withholding Act, or engaging financial hardship procedures.

c)    The city and the state have accepted the proof of financial hardship terms of the CDC ERA Funding.

d)    Where the city disagrees with CDC ERA Funding requirements, *ala* late fees, it has acted differently.

e)    The city has established rules for police to gather evidence on-spot and take on-spot actions in Landlord tenant disputes — https://www.phila.gov/media/20180207152346/Information-bulletin-on-landlord-tenant-disputes.pdf

f)    The established police procedures do not require tenants to provide proof that they have engaged any financial hardship procedures or that they are acting in accordance with the Rent Withholding Act. By so doing, the city has "contracted" noncompliant tenants, who simply do not want to pay, to "steal" or confiscate commodities or services from landlords. This stealing happens at least between the times the landlord files eviction action and the time the Sheriff comes out to execute a writ of possession, and is exacerbated where the timelines in sections 502-504 of the Landlord Tenant Act of 1951 are not adhered to.

g) the city's arbitrary, harsh or oppressive ordinances allow noncompliant (former) tenants who simply do not want to pay to abuse landlords and is therefore unjust. *Connecticut v. Doehr*, 501 U.S. 1, 14 (1991) (citation omitted).

h) the tenant's obligation to pay rent [is but one obligation necessary to maintain property interests in the rented premises] ~~and the landlord's obligation imposed by the implied warranty of habitability to provide and maintain habitable premises are, therefore dependent~~ and a material breach of one of these obligations will relieve the obligation of the other so long as the breach continues.

134.     That is, the city has essentially expressed that regardless of how unjust it is, tenants may abuse landlords for significant amounts of time beyond that which is allowed under sections 502-504 of the Landlord Tenant Act of 1951. Moreover, "while due process is "not a technical conception . . . unrelated to time, place and circumstances," this Court [the Supreme Court of the U.S.] has adopted a "familiar threefold inquiry" for assessing what process is due when the government seeks to alter procedures in private disputes to provide one party "the overt, significant assistance of state officials." Doehr, 501 U.S. at 10-11 (citation and internal quotation marks omitted). That inquiry considers: (1) the private interest affected by the official action; (2) the "risk of an erroneous deprivation of such interest" via the existing procedures, and "the probable value, if any, of additional or substitute safeguards"; and (3) the interest of the party seeking the procedure, with "due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections." Ibid. (quoting Mathews, 424 U.S. at 335).

# Section 1983 Case Where Claim for Immunity Denied to Sheriff Via Official Capacity Court Staff – TRS. Of GEN. Assembly of Lord Jesus Christ of Apostolic Faith Inc V. Patterson [See Section B(b), also see (B)(a)]

https://www.casemine.com/judgement/us/60638c684653d05de834140a

135.     To make out the claims, the Plaintiff sues in both official and personal capacity seeking damages, relief in equity and declaratory relief. The main argument is that when sued in personal capacity, with equitable and declaratory relief, "immunity" defenses are not available — see *Ex Parte Young*, Page 209 U. S. 151 Through Page 209 U. S. 152. Page 209 U. S. 153 Page 209 U. S. 154 Page 209 U. S. 155 Page 209 U. S. 156 Page 209 U. S. 157 Page 209 U. S. 158 Page 209 U. S. 158 Equitable relief in the form of "prospective injunctive" relief also precludes immunity of the state based on the Eleventh Amendment of the U.S. Constitution.

# Constitutional Provisions Apply Equally to Municipalities and States

136.     "United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of Virgin Islands, 842 F.3d 201, 210 (3d Cir. 2016) (quoting U.S. Const.

art. I, § 10). The Contracts Clause "applies equally to municipal ordinances." Alarm Detection Sys., Inc. v. Vill. of Schaumburg, 930 F.3d 812, 822 (7th Cir. 2019) (citing St. Paul Gaslight Co. v. City of St. Paul, 181 U.S. 142, 148 (1901))." See HAPCO v Philadelphia, note 46.

# Jurisdiction and Confiscatory Nature of Acts

*Ex parte Young*, 209 U.S. 123 (1908)

https://www.casemine.com/judgement/us/5914aa09add7b0493471b6c6

137.       The Municipal court cannot maintain jurisdiction because of the following holding:

"Attention is also directed to the case of *Missouri &c. Rwy. Co. v. Missouri R.R. &c. Commissioners,* 183 U.S. 53. That was a suit brought in a state court of Missouri by the railroad commissioners of the State, who had the powers granted them by the statutes set forth in the report. Their suit was against the railway company, to compel it to discontinue certain charges it was making for crossing the Boonville bridge over the Missouri river. The defendant sought to remove the case to the Federal court, which the plaintiffs resisted, and the state court refused to remove, on the ground that the real plaintiff was the State of Missouri, and it was proper to go behind the face of the record to determine that fact. In regular manner, the case came here, and this court held that the State was not the real party plaintiff, and the case had therefore been properly removed from the state court, whose judgment was thereupon reversed."

"Although the determination of whether a railroad rate prescribed [] by a state statute is so low as to be confiscatory involves a question of fact, its solution raises a Federal question, and the sufficiency of rates is a judicial question over which the proper Circuit Court has jurisdiction, as one arising under the Constitution of the United States. Whether a state statute is unconstitutional because the penalties for its violation are so enormous — such that they are "harsh and oppressive;" or has a draconian impact — that persons affected thereby are prevented from resorting to the courts for the purpose of determining the validity of the statute and are thereby denied the equal protection of the law and their property rendered liable to be taken without due process of law, is a Federal question and gives the Circuit Court Jurisdiction."

"A state railroad rate statute which imposes such excessive penalties that parties affected are deterred from testing its validity in the courts denies the carrier the equal protection of the law without regard to the question of insufficiency of the rates prescribed; it is within the jurisdiction, and is the duty, of the Circuit Court to inquire whether such rates are so low as to be confiscatory, and, if so, to permanently enjoin the railroad company, at the suit of one of its stockholders, from putting them in force, and it has power pending such inquiry to grant a temporary injunction to the same effect.

While there is no rule permitting a person to disobey a statute with impunity at least once for the purpose of testing its validity, where such validity can only be determined by judicial investigation and construction, a provision in the statute which imposes such severe penalties for disobedience of its provisions as to intimidate the parties affected thereby from resorting to the courts to test its validity practically prohibits those parties from seeking such judicial construction, and denies them the equal protection of the law.

The attempt of a State officer to enforce an unconstitutional statute is a proceeding without authority of, and does not affect, the State in its sovereign or governmental capacity, and is an illegal act, and the officer is stripped of his official character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to its officer immunity from responsibility to the supreme authority of the United States.

When the question of the validity of a State statute with reference to the Federal Constitution has been first raised in a Federal court, that court has the right to decide it to the exclusion of all other courts.

It is not necessary that the duty of a State officer to enforce a statute be declared in that statute itself in order to permit his being joined as a party defendant from enforcing it; if, by virtue of his office, he has some connection with the enforcement of the act, it is immaterial whether it arises by common general law or by statute.

Page 209 U. S. 125

While the courts cannot control the exercise of the discretion of an executive officer, an injunction preventing such officer from enforcing an unconstitutional statute is not an interference with his discretion.

The Attorney General of the State of Minnesota, under his common law power and the state statutes, has the general authority imposed upon him of enforcing constitutional statutes of the State, and is a proper party defendant to a suit brought to prevent the enforcement of a State statute on the ground of its unconstitutionality.

While a Federal court cannot interfere in a criminal case already pending in a state court, and while, as a general rule, a court of equity cannot enjoin criminal proceedings, those rules do not apply when such proceedings are brought to enforce an alleged unconstitutional state statute, after the unconstitutionality thereof has become the subject of inquiry in a suit pending in a Federal court which has first obtained jurisdiction thereover; and, under such circumstances, the Federal court has the right in both civil and criminal cases to hold and maintain such jurisdiction to the exclusion of all other courts.

While making a state officer who has no connection with the enforcement of an act alleged to be unconstitutional a party defendant is merely making him a party as a representative of the State, and thereby amounts to making the State a party within the prohibition of the Eleventh Amendment, individuals, who, as officers of the State, are clothed with some duty in regard to the enforcement of the laws of the State, and who threaten and are about to commence an action, either civil or criminal, to enforce an unconstitutional state statute, may be enjoined from so doing by a Federal court.

Under such conditions as are involved in this case, the Federal court may enjoin an individual or a state officer from enforcing a state statute on account of its unconstitutionality, but it may not restrain the state court from acting in any case brought before it either of a civil or criminal nature, or prevent any investigation or action by a grand jury.

An injunction by a Federal court against a State court would violate the whole scheme of this Government, and it does not follow that, because an individual may be enjoined from doing certain things, a court may be similarly enjoined.

No adequate remedy at law, sufficient to prevent a court of equity from acting, exists in a case where the enforcement of an unconstitutional state rate statute would require the complainant to carry merchandise at confiscatory rates if it complied with the statute, and subject it to excessive penalties in case it did not comply therewith, and its validity was finally sustained.

While a common carrier sued at common law for penalties under, or on indictment for violation of, a state rate statute might interpose as a defense the unconstitutionality of the statute on account of the confiscatory character of the rates prescribed, a jury cannot intelligently pass upon such a matter; the proper method is to determine the constitutionality of the statute in a court of equity in which the opinions of experts may be

Page 209 U. S. 126

taken and the matter referred to a master to make the needed computations and to find the necessary facts on which the court may act.

A state rate statute is to be regarded as *prima facie* valid, and the onus rests on the carrier to prove the contrary.

The railroad interests of this country are of great magnitude, and the thousands of persons interested therein are entitled to protection from the laws and from the courts equally with the owners of all other kinds of property, and the courts having jurisdiction, whether Federal or State, should at all times be open to them, and, where there is no adequate remedy at law, the proper course to protect their rights is by suit in equity in which all interested parties are made defendants."

# Municipal Court of Philadelphia Amendment Under Rule 205.4(d)

138.     The Plaintiff now seeks an amendment under rule 205.4(d) for these submissions to be included with the submissions of July 16, 2021 due to matters that arose during and after the filing of July 16, 2021. Plaintiff now seeks a declaration that Section 9-3901(4)(e) [and/or combined with 9-3902 and/or 9-3903] is invalid, under the supremacy clause of Article six(6) of the Constitution, because it is pre-empted by, or is inconsistent with, Article I(1) and/or Article I(11) of the Pennsylvania Constitution — also see PA R. Civ. P. 128(c) — and/or the Fifth and/or Fourteenth Amendment of the U.S. Constitution in so far as the alleged infirmed city or statute breaches the Plaintiff's right to acquire, possess, protect and/or defend property and/or property interests; and not to be deprived of said property without due process of law or the equal protection of the law. That is, the alleged infirmed city or state statutes seeks to give possession of the property of landlords to non-complying (former) tenants or squatters while depriving the landlord of the right to seek to evict such tenants or to charge rental rates above $0. This is so because the infirmed city or state statute bars court action by the landlord to recover possession, and to collect rent; the Police Commissioner and the police are under a duty to allow "lawful tenants" to immediately regain possession; and sections 502-504 of the Landlord Tenant Act of 1951 (especially where the timelines set therein are breached), together with judicial development as

outlined in *Wofford v Vavreck*, bars self-help evictions such that the effect of the infirmed state statute is confiscatory and, therefore, invalid and/or unconstitutional— see *Ex parte Young*, 209 U.S. 123 (1908), <u>Page 209 U. S. 147 of</u> . Together, the last two bars foreclose a landlord's right to acquire, possess, protect and/or defend property and/or property interests. NB: The Prothonotary, Municipal Court Administrator, Landlord-Tenant Officer and Bradley K Moss SJ — see Federal Rule of Civil Procedure 19(a) — are proper defendants as articulated in *Finberg v Sullivan* [see Section A within the majority decision case] (https://www.casemine.com/judgement/us/5914c4a0add7b049347ced06#p53).

139.      The Prothonotary, Municipal Court Administrator, Landlord-Tenant Officer and Bradley K Moss SJ by virtue of his/her official office has "some connection" to the enforcement of the infirmed city or state statute in that it is the Prothonotary, Municipal Court Administrator, Landlord-Tenant Officer and Bradley K Moss SJ who either notifies the court of failure to obtain a license or rejects documents that a plaintiff landlord seeks to file. As such, this is a suit against the Prothonotary, Municipal Court Administrator, Landlord-Tenant Officer and Bradley K Moss SJ personally — thus the Eleventh Amendment Bar does not apply, see *Ex Parte Young*, <u>Page 209 U. S. 151 through Page 209 U. S. 152</u>   <u>Page 209 U. S. 158</u> — and this suit should avoid summary judgment under Federal Rule of Civil Procedure 56. *Ex parte Young*, 209 U.S. 123 (1908) (https://www.casemine.com/judgement/us/5914aa09add7b0493471b6c6#p157) ).

140.      The Prothonotary, Municipal Court Administrator, Landlord-Tenant Officer and Bradley K Moss SJ or persons acting on behalf of, or with the authority of, the Prothonotary, Municipal Court Administrator, Landlord-Tenant Officer and Bradley K Moss SJ has worked injury to the Plaintiff in the instant case, and other plaintiff landlords, by notifying the court that such plaintiffs are not in compliance with the alleged infirmed city or state statute. Further, said persons have also required Plaintiff to sign documents indicating that his court action may be dismissed prior to hearing because of failure to comply with the alleged infirmed city or state statute.

141.      Counter Arguments – in processing documents, Prothonotary, Municipal Court Administrator, Landlord-Tenant Officer and Bradley K Moss SJ were not performing judicial acts or any "functionable comparable acts. They were not performing a judicial act. Instead, they were performing an administrative act. Furthermore, once court officers have determined that documents are to be processed, they do not have discretion to engage in misrepresentation, via omission, to cut off, preclude or foreclose enquiry in certain specific directions — license, applicability and protection under the 2-4 Unit Owner Occupied Activity License Number.

# Section 1983 Case Where Claim for Immunity Via Following Court Order Denied – Hamilton v Leavy

https://www.casemine.com/judgement/us/5914b834add7b04934783a56#p782

142.      see Section B within the case for principles on Quasi-Judicial Immunity which requires acting "functionally comparable" to a judge for absolute immunity to attach.

143.      Even if judicial immunity extends to the named court officers, transcribing the complaint onto an official court form from the Plaintiff's written submissions does not include the discretion necessary to transport such acts from the realm of the ministerial, or administrative, to the realm of a "judicial act" – see Deferro v Coco (1989) at [10]. As such, the court clerk's/officer's actions in the instant case are not functionally comparable to that of a judge. That is, if a judge were to knowingly omit relevant material, the judge's decision would be overturned on appeal for abuse of discretion, or would be regarded as no decision at all for breach of the due process clause and/or breach of the equal protection clause.

# Affidavit of Darron Thomas in Constitutionality Challenge of PLTO

## Exhibit 101 — Actual Written Claim Presented to Court Officers on July 16, 2021

# Eviction Claim Against Ashley Banks 87 W Sharpnack Street, Philadelphia, PA 19119

**I.** Plaintiff states that he/she/it owns the real property located at the following address: 87 W Sharpnack Street, 3rd Floor, Philadelphia, PA 19119. Plaintiff further states that there is a lease between him/her/it and the above-referenced defendant(s). The lease is written, and began on 04/01/2021 for the term of a year or more. Additionally, plaintiff states that the lease is residential, and is attached as Exhibit 4.

**II.** Plaintiff states that he/she/it rents 1-3 units at a property that he/she/it occupies and therefore does not need a license under Section 9-3902 of the Philadelphia Code by which requires a valid Rental License at the time of filing this complaint. Instead, given that 1-3 units are rented in a property that the plaintiff occupies, the plaintiff has an Activity license Number as required by the Philadelphia Department of License and Inspections — see Exhibit 1.
• The Plaintiff has maintained an Activity License Number since 2007. The Plaintiff's Activity License Number is 2836252.

**III.** Plaintiff states that he/she/it is not required to be in compliance with Section 9-3903 of the Philadelphia Code as a result of the plain language of Section 9-3903(1)(a) of the Philadelphia Code which reads "[t]he owner of any property for which a rental license is required shall ... []." As such, the textual construction of statutes dictates that the Plaintiff does not have to be in compliance with Section 9-3903 of the Philadelphia Code. This is so as Section 9-3903 of the Philadelphia Code is not applicable, since Section 9-3902 of the Philadelphia Code does not apply to the Plaintiff because of the owner occupied, 1-3 unit rental exemption provided for by the Department of License and Inspections as discussed in the previous paragraph.

**IV.** Plaintiff states that the leased property:
   A. was built before March of 1978.
   B. is not a residential property developed by or for an educational institution for the exclusive use and occupancy by that institution's students.
   C. is not owned or subsidized by the Philadelphia Housing Authority or its subsidiaries, or privately owned and leased under the Housing Choice Voucher Program; and
   D. At no time during the tenancy application process or moving in did the prospective tenant indicate that she has a child aged six or younger.
   E. The lease is effective from April 01, 2021 to March 31, 2022 and would have converted to Tenancy At Will after that date.

**V.** I have not provided the defendant with a valid certification prepared by a certified lead inspector stating that the property is either lead free or lead safe.

**VI.** Plaintiff states that the subject premises is fit for its intended purpose. Plaintiff states that he/she/it is unaware of any open notice issued by the Department of Licenses and Inspections ("Department") alleging that the property at issue is in violation of one or more provisions of the Philadelphia Code.

**VII.** Plaintiff states that, based on a nonpayment of rent, notice to vacate the subject premises by 07/16/2021 was served on the defendant on 07/06/2021. A copy of the notice is attached as Exhibit 2. Plaintiff also states that, based on a breach of material conditions of the tenancy agreement, a further notice to vacate the subject premises by 08/02/2021 was served on the defendant on 07/02/2021. A copy of the notice is attached as Exhibit 3, and further supporting evidence is provided in Exhibits 6 through 11 .
• Breach of a condition(s) of the lease other than nonpayment of rent. The conditions allegedly breached were: SPECIFIED IN EXHIBIT 3 AND ATTACH TO CLAUSE 17.

**VIII.** The defendant is in possession of the property and refuses to surrender possession of the property.

**IX.** Plaintiff demands a judgment of possession and a money judgment in the amount itemized below based on the following:
• Nonpayment of amounts due under the lease, for 1 months, from: JUL, 2021 to and including: Present time.
The amount of unpaid rent below, unpaid utilities and late fees alleged due. Summarized alleged amounts due:

| Amounts Owed By Ashley Banks For Unpaid Rent, Utilities and Fees | | | Cumulative Total |
|---|---|---|---|
| Month | Year | Description | Amount in $ | |
| July | 2021 | Unpaid Rent | 1,090.00 | 1,090 |
| July | 2021 | Insufficient Funds Fee | 100.00 | 1,190 |
| July | 2021 | Late Fee at 5% of rent/per day late (15 days @ $54.50/day) | 817.50 | 2,007.5 |
| May | 2021 | Electricity | 108.04 | 2,115.54 |
| June | 2021 | Electricity | 66.28 | 2,181.82 |

1 | P a g e

| June | 2021 | Gas | | 31.63 | 2,213.45 |
| July | 2021 | Damages (yet to be determined) | | | |
| July | 2021 | Grand Total | | | |

ONGOING RENT IN THE AMOUNT OF $1,090.00/month FROM THE DATE OF THE FILING OF THIS COMPLAINT TO THE DATE OF THE HEARING ON THE MERITS IN THIS MATTER.

**Landlord's Signature:** _DARRON ANTHONY THOMAS_

**Date Signed:** _July 16, 2021_

# Exhibit 102 – Claim Transcribed To Court Forms on July 16, 2021

## ACKNOWLEDGMENT OF DOCUMENT REVIEW

We need you to read the following acknowledgments to ensure that you are satisfied with the filing, the wording in the Statement of Claim and/or the Landlord Tenant Complaint form and that you agree that all personal information has been removed from each and every document used in your filing since our docket is available for public viewing.

1. You agree that you have read the entire filing and agree with the wording, terminology and content.

2. You agree that all of the names, addresses (including suite, apartment numbers and floors) and any other information in the caption block are correct.

3. You agree that it is your responsibility to remove all personal information that is shown on any form used in the filing. This includes information pertaining to you, any party named in the filing and any other individual who has information included on the documents submitted as evidence. This information includes, but is not limited to, phone numbers, account numbers, social security numbers, routing numbers, bank accounts and tax information.

4. You have submitted, if available, your email address and cell phone number in case you need to be contacted by the court regarding the filing.

By signing this form you agree that you have read the document in full, have been given the opportunity to revise your filing and/or to ask any questions regarding the filing process.

Filer- *Darron Thomas*   Date- 07/16/2021

Court Representative- F. FIGANIAK III

*I have read the typed documents I brought to the court. Court Officers did not provide me all the documents they created from my submissions!*



### PHILADELPHIA MUNICIPAL COURT
### FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
1339 Chestnut Street, 10th Floor, Philadelphia, PA 19107

Patrick F. Dugan, President Judge        John J. Joyce, Deputy Court Administrator

### LANDLORD AND TENANT COMPLAINT
# LT-21-07-16-3590

Date Filed: 07/16/2021

Complaint Continuation

| | |
|---|---|
| DARRON A THOMAS<br>87 W SHARPNACK ST<br>PHILADELPHIA, PA 19119<br><div align="right">*Plaintiff(s)*</div> | ASHLEY BANKS, AKA/DBA: AND ALL OCCUPANTS<br>87 W SHARPNACK ST 3RD FL<br>PHILADELPHIA, PA 19119<br><div align="right">*Defendant(s)*</div> |

I.   Plaintiff states that he/she/it owns the real property located at the following address: 87 W SHARPNACK ST, 3RD FL, PHILADELPHIA, PA 19119. Plaintiff further states that there is a lease between him/her/it and the above-referenced defendant(s). The lease is written, attached and began on 04/01/2021 for the term of a year or more. Additionally, plaintiff states that the lease is residential.

IV.  Plaintiff states that the leased property:

    A.   was built before March of 1978.

    B.   is not a residential property developed by or for an educational institution for the exclusive use and occupancy by that institution's students.

    C.   is not owned or subsidized by the Philadelphia Housing Authority or its subsidiaries, or privately owned and leased under the Housing Choice Voucher Program; and

    D.   has not had and will not have a child aged six or younger.

    E.   The lease is effective from December 21, 2012 to the present.

V.   I have not provided the defendant with a valid certification prepared by a certified lead inspector stating that the property is either lead free or lead safe.

VI.  Plaintiff states that the subject premises is fit for its intended purpose.

Plaintiff states that he/she/it is unaware of any open notice issued by the Department of Licenses and Inspections ("Department") alleging that the property at issue is in violation of one or more provisions of the Philadelphia Code.

VII. Plaintiff states that notice to vacate the subject premises by 07/16/2021 was given to the defendant on 07/06/2021. A copy of the notice is attached.

VIII. The defendant is in possession of the property and refuses to surrender possession of the property.

IX.  Plaintiff demands a judgment of possession and a money judgment in the amount itemized below based on the following:



**PHILADELPHIA MUNICIPAL COURT**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
1339 Chestnut Street, 10th Floor, Philadelphia, PA 19107
Patrick F. Dugan, President Judge          John J. Joyce, Deputy Court Administrator

**LANDLORD AND TENANT COMPLAINT**

Date Filed: 07/16/2021                    # LT-21-07-16-3590

Complaint Continuation

* Nonpayment of amounts due under the lease, for 1 months, from: JULY, 2021 to and including: JULY, 2021

| The amount of unpaid rent below and late fees alleged due. | Summarized alleged amounts due: | |
|---|---|---|
| **Month   Year    Rent     Late Fee** | Rent | $1,090.00 |
| JULY    2021    $1090    $817.50 | Late Fees | $817.50 |
| ELECTRIC BILL $174.32 | Gas | $31.63 |
| GAS BILL $31.63 | Electric | $174.32 |
| INSUFFICIENT FUNDS FEE $100 | Water / Sewer | $0.00 |
| | Attorney's Fees | $0.00 |
| | Other | $100.00 |
| | INSUFFICIENT FUNDS FEE | |
| | Subtotal | $2,213.45 |
| | Court Costs | $116.75 |
| | **Total** | **$2,330.20** |

ONGOING RENT IN THE AMOUNT OF $1,090.00 FROM THE DATE OF THE FILING OF THIS COMPLAINT TO THE DATE OF THE HEARING ON THE MERITS IN THIS MATTER.

* Breach of a condition(s) of the lease other than nonpayment of rent. The conditions allegedly breached were:
THREATS, ADDITIONAL BREACHES ARE SPECIFIED IN EXHIBIT 3 AND ATTACHED TO CLAUSE 17.

# Exhibit 103 for Ashley Banks Eviction



# Exhibit 104 — Proof of Philadelphia's Voluntary Participation Under the CDC ERA Funding



## Exhibit 105 – Misrepresentation By L&I and Dept. of Revenue



# Exhibit 106 – Municipal Court of Philadelphia's Notice of Noncompliance

IN THE PHILADELPHIA MUNICIPAL COURT

DARRON A THOMAS                              :
                                             :
Plaintiff(s),                                :
                                             :        LT-21-07-16-3590
        v.                                   :
                                             :
                                             :
ASHLEY BANKS                                 :
                                             :
Defendant(s).                                :

### NOTICE OF NONCOMPLIANCE WITH
### PHILADELPHIA MUNICIPAL COURT CIVIL RULE 109(4)

Pursuant to Rule 109(4), you are required to attach to your landlord-tenant complaint (1) a copy of the applicable Rental License for any month for which you are seeking to collect rent and (2) a copy of the Certificate of Rental Suitability that was provided to the tenant. You have failed to do so as specified in the paragraphs that are checked below.

As a result of your failure to submit the required documents, you may not be able to collect rent for certain months and/or be unable to evict the tenant because of a Philadelphia Ordinance that prohibits a landlord from collecting rent or evicting a tenant under those circumstances. You may bring to court on the day of your trial additional Rental Licenses or a Certificate of Rental Suitability that was provided to the tenant at an earlier date than the Certificate of Rental Suitability submitted with your landlord-tenant complaint.

[ X ] **No Rental License.** You have not submitted a Rental License. A Philadelphia Ordinance prohibits the collection of rent or the eviction of a tenant unless the landlord has a Rental License that is in force at the time that of the filing of the landlord-tenant complaint. Therefore, you will not be able to collect any unpaid rent unless you bring with you to court a Rental License that was in effect on the date that you filed your landlord-tenant complaint.

[   ] **No Rental License for Certain Months for which Rent is Claimed.** You are seeking unpaid rent for _____ months from _____ (month), _____ to and including _____ (month), _____. You have not submitted a Rental License that was in force for those months. A Philadelphia Ordinance prohibits the collection of rent for those months in which there was no Rental License for those months in which there was no Rental License. Therefore, you will not be able to collect unpaid rent for those months unless you bring with you to court Rental Licenses that were in effect for those months.

# Exhibit 107 — Philadelphia Police Department Citizen Information Bulletin #3



## PHILADELPHIA POLICE DEPARTMENT

### CITIZEN INFORMATION BULLETIN #3
### LANDLORD-TENANT DISPUTES

1. A landlord or a landlord's agent can not evict or lock out a tenant without legal process. (WRIT OF POSSESION)  Without legal process such unlawful eviction practices include, but are not limited to:

   A. Plugging, changing, adding or removing any lock or otherwise blocking access to a dwelling unit (lockouts).

   B. Removing windows and doors from a dwelling unit.

   C. Interfering with utility services to the dwelling unit such as electricity, gas, hot/cold water, heat, or telephone service.

   D. Forcing a tenant to vacate by use of force or threat of violence or injury to a tenant's person or property.

   E. Engaging in any activity or pattern of activity which renders a dwelling unit or any part thereof inaccessible to the tenant.

   F. Failing to take reasonable and prompt action to restore access to a dwelling unit following any incident of landlord described above.

      1. Whenever police are called to a dispute involving a possible landlord tenant problem police will:

         a. Establish the identities (tenant/landlord relationship) of the parties involved. If the landlord is not present, attempt to contact him/her whenever practical.

         b. Issue the "Tenant's Referral Notice" to all concerned parties and request parties to read same. (See below)

         c. Verify that the landlord has followed the legal process by requiring the landlord to produce a copy of the Alias Writ of Possession.  This is the legal document, signed by a Judge, necessary to effect an eviction.

      2. If the landlord is unable to produce a copy of the Alias Writ of Possession:

         a. Police will inform the tenant that he/she is entitled to regain possession of the premises immediately.

1

b. Police personnel will inform the landlord or his/her agent to take prompt action to restore access to the dwelling unit or arrest the landlord for a violation of the applicable ordinance. The landlord MUST have a WRIT OF POSSESSION from Municipal Court in order to have a tenant lawfully evicted.

**NOTE:** Police personnel will not physically assist the tenant in regaining entry. Police will provide stand-by assistance while the tenant regains immediate entry to the dwelling unit.

---

### CITY OF PHILADELPHIA • POLICE DEPARTMENT
### TENANT'S REFERRAL NOTICE

Self-help eviction practices are actions by landlord or a landlord's agent taken without legal process to dispossess or attempt to dispossess a tenant from a dwelling unit or threatening to engage in any other conduct which prevents or is intended to prevent a tenant from lawfully occupying a dwelling unit. Self-help eviction practices include, but are not limited to the following:

1. Plugging, changing, adding or removing any lock or otherwise blocking access to a dwelling unit (lockouts).

2. Removing windows and doors from a dwelling unit.

3. Interfering with utility services to the dwelling unit such as electricity, gas, hot/cold water, heat, or telephone services.

4. Forcing a tenant to vacate by use of force or threat of violence or injury to a tenant's person or property.

5. Engaging in any activity or pattern of activity which renders a dwelling unit or any part thereof inaccessible to the tenant.

6. Failure to take prompt and reasonable action to restore access and habitability to a dwelling unit following any incident of the landlord conduct described above.

If you need further information, contact the following agencies.

Tenant's Action Group of Philadelphia
21 S. 12th Street
(215) 575-0700

Community Legal Services
1424 Chestnut Street
(215) 981-3700

Office of Emergency Shelter & Services
1315 Cherry Street
(215) 686-5671                          75-Misc.-9

---

\*\*\*\*\*

2

**Exhibit 108 – Proof of At Least $2,200 in Ashley Banks'
Bank Account**



# Exhibit 109 — 2-4 Unit Owner Occupied License Is A Substitute For Commercial Activity License

**2:03**      ..ıll LTE ▪

🔒 phila.gov

The vaccine is available to everyone 12 and older. Find a **City-run vaccine clinic** ↗ or **partner vaccine clinic** ↗ to protect yourself and your loved ones. If you have questions about vaccination, call **(215) 685-5488**.

🏠   **Services** / **Property, lots & housing** /
**Buy, sell, or rent a property** / **Information about renting** /
Rent your property

## 🏠 Property, lots & housing

Rent your property

### Service overview

Landlords in the City need to follow certain requirements.

### Requirements

#### Commercial Activity License (CAL) or Owner-Occupied Housing License

You need a **Commercial Activity License** to do business in the City of Philadelphia.

If your property has four or fewer rental units and you live in one of them, you don't need a Commercial Activity License. You need **a 2-4 Unit Owner-Occupied Housing License**.

#### Business Income & Receipts Tax (BIRT)

**BIRT numbers** are assigned by the Department of Revenue to identify tax accounts. You use this number to apply for all licenses. You apply for your Commercial Activity License and

# Exhibit 110 – Reproduce Exhibit 2 From July 16, 2021 Filing Showing CAL Instead of Renters License



**Landlord's/Plaintiff's Signature:** _ s/DARRON A THOMAS_

**Date Signed:** _August 13, 2021_

The Case Must Be Moved to the Federal Courts Under 28 U.S. Code § 1443

The infirmed city or state law purport to protect tenants on the basis that they have an "equal right" to rented premises and the Municipal Court of Philadelphia's Noncompliance Notice claims that a Philadelphia Ordinance prevents it from proceeding where the alleged infirmed city or state statutes are violated. As such, the instant case should be removed to the Eastern District of Pennsylvania for the U.S. Federal courts because at least the Due Process Clause of the U.S. Constitution is implicated in these proceedings.

Procedural Due Process Does Not Require a Court Hearing

https://www.law.cornell.edu/constitution-conan/amendment-14/section-1/procedural-due-process-civil

"[Due] process, however, will vary depending on the circumstances and subject matter involved.738 A basic threshold issue respecting whether due process is satisfied is whether the government conduct being examined is a part of a criminal or civil proceeding.739 The appropriate framework for assessing procedural rules in the field of criminal law is determining whether the procedure is offensive to the concept of fundamental fairness.740 In civil contexts, however, a balancing test is used that evaluates the government's chosen procedure with respect to the private interest affected, the risk of erroneous deprivation of that interest under the chosen procedure, and the government interest at stake.741"

...

"A court proceeding is not a req-uisite of due process.745 Administrative and executive proceedings are not judicial, yet they may satisfy the Due Process Clause.746 Moreover, the Due Process Clause does not require *de novo* judicial review of the factual conclusions of state regulatory agencies,747 and may not require judicial review at all.748 Nor does the Fourteenth Amendment prohibit a state from conferring judicial functions upon non-judicial bodies, or from delegating powers to a court that are legislative in nature.749 Further, it is up to a state to determine to what extent its legislative, executive, and judicial powers should be kept distinct and separate.750"

Philadelphia Cases Regarding Rental Licenses and Rental Suitability Certificates

*Frempong v Richardson*

https://www.casemine.com/judgement/us/5cd2fd8f342cca101f19eab7

This is a Philadelphia case allowing eviction but not rent payments where landlords did not have rental suitability certificate or Rental License.

Martin v Levy Law Case Documents found here:

https://www.pubintlaw.org/cases-and-projects/gerrell-martin-v-levy-law-fighting-for-renters-in-landlord-tenant-court-case-documents/

"Ricchetti v. Ellis, PICS Case No. 16-1425 (C.P. Philadelphia Sept. 7, 2016) Moss, J. (23 pages).

The failure to deliver to tenants a certificate of rental suitability at the inception of a lease did not render that lease void and unenforceable where the failure was correctable."

*Rittenhouse v Barclay White Inc.*
https://cases.justia.com/pennsylvania/superior-court/2017-353-eda-2015.pdf?ts=1498598481

It is apparent from this case that if a Landlord does not have a license, but could obtain one, the Landlord is not barred from collecting rent.

> "Appellant contends that a landlord cannot maintain a claim for money applicable to a period of time before the issuance of the required certification, license, or permit. He cites in support Rittenhouse v. Barclay White, Inc., 625 A.2d 1208 (Pa. Super. 1993). However, that case does not support his contention. The Rittenhouse Court held that although the occupancy of a residence was in violation of a building code, the lease was not void for illegality because said lease could be performed without violating the statute and was not per se illegal. Id. at 1211. Similarly the Court, in finding the lease valid and enforceable, noted that the defendant made no assertion that a permit would not have been forthcoming had the proper application been filed. Id. at 1211. Further, at the time of defendant's termination of the lease, the landlord was in the process of reapplying for a multiple occupancy permit. Id. at 1211. Thus, although the landlord did not have the proper permit, the lease itself was valid and enforceable, and could be performed without violating the statute. Id.

> Here, the trial court concluded that the Code entitled the landlord to collect unpaid rent after he provided the certificate and handbook to the tenants, and that the Lease itself was valid and enforceable. We see no error in this conclusion. Estman, 868 A.2d at 1212; Rittenhouse, 625 A.2d at 1210-11."

# The Philadelphia Ordinances Breach the Contracts Clause, Or Lend Aid To The Breach of Conditions

The Plaintiff does not advocate self-help evictions and is definitely not petitioning for self-help evictions to be legalized. However, the Plaintiff petitions for the police and/or Police Commissioner to be enjoined such that they are restrained from breaching the Contract Clause of the Constitution, or from lending aid to the breach of fundamental conditions of a contract where that breach can be objectively proven. The Philadelphia Ordinances — especially 9-1601, 9-1602, 9-1603, 9-1604, 9-1605 — allow the police to secure immediate repossession for tenants. This seems to be without condition as there is no definition of "lawfully occupying" and/or the police certainly do not seem to be attentive to whether an enforceable contract between landlord and tenant is current at the time the police are called to a landlord-tenant dispute. In the instant case where the tenant committed material breaches both in terms of payment and otherwise, the Contract Clause allows the landlord to suspend or terminate service. As such, the Philadelphia Ordinances are a "[l]aw impairing the Obligations of Contracts" within the meaning of the Contract Clause. This is of course with the presumption that self-help remedies are illegal. Furthermore, where the tenant [together with the landlord] agrees to terminate the contract, as agreed to for August 02, 2021 in the instant case, or

there is a total breach, no contract exists any longer and a landlord is under no obligation to perform under the contract which no longer exists. Ashley Banks' actions amounted to a total breach of the contract so that it was terminated, as she did not pay rent and breached multiple other conditions of the lease. The tenant also cannot unilaterally choose to re-engage the contract without fulfilling its material and/or fundamental terms, as Ashley Banks claimed to have done on August 01, 2021. Even if such a unilateral re-engagement of the contract were legally allowable, the tenant must be under some obligation to give fair and/or adequate notice to the landlord. In the instant case, such fair and/or adequate notice was clearly not given.

It is to be noted that the payment of rent is a fundamental condition in a landlord-tenant relationship. Clearly, such a fundamental condition is a "heightened and objective" material condition. In the circumstances described, given that self-help is illegal, when police arrive at a landlord-tenant dispute, police should enforce a lockout. This is so because the counter option of allowing the tenant immediate repossession repudiates the right of the landlord to not perform under a contract where there is breach of a material condition, or where there is agreement to terminate the contract, or where the contract is terminated for a total breach. It is to be noted that the breach of a material [or fundamental] condition, and/or where the contract is terminated, the tenant has surrendered any due process rights that may have been acquired under a tenancy agreement. As such, in the circumstances of the instant case, where the police allow immediate repossession, they are lending aid to a breach of the Contracts Clause of the U.S. Constitution; or an objectively provable — rent receipts; hardship forms; or notices under the Rent Withholding Act — condition of the contract. As already demonstrated, the Philadelphia Ordinances cannot satisfy the standards "In *United States Trust*[1], [where] the Court ruled that an impairment would be upheld only if it were "necessary" and "reasonable" to serve an important public purpose." Since the Philadelphia Ordinances are aimed at forcing landlords in the position of the instant landlord to provide housing to tenants who don't pay rent, and do so without cause, the Philadelphia ordinances, as with the law involved in *United States Trust*, is intended to vary the obligations of parties to a contract. The Due Process Clause is also implicated because the landlord in the instant case is denied the right to protect his property and/or property interests. Effectively, the police confiscate the landlord's property and turn it over to non-paying "tenants" with no standards that guide or restrain the police — the Rent Withholding Act and/or CDC ERA Funding programs set such standards, but the Philadelphia Ordinances and police are not attentive to those standards. That is, it is not necessary to leave landlords as sitting ducks to "tenants" who simply refuse to pay, nor is it reasonable. Prolonging "tenancies" where the "tenant" violates the fundamental conditions of the agreement cannot be considered a legitimate city or state purpose. This makes the violation of the Contracts Clause clear. Legal authority for the last two paragraphs, including this one, is best articulated as follows:

"Right to suspend performance for material breach

General rule

A party is entitled to suspend its performance in case of a material breach by the other party. This right of suspension is premised on the concept that one party's performance is a "constructive condition" of the other party's performance [2]. There is a

---

[1] United States Trust Co. v. New Jersey, 431 U.S. 1, 16 (1977). *See also* Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 241 (1978), at 244–51; and Exxon Corp. v. Eagerton, 462 U.S. 176 (1983), at 27-39. Also see 431 U.S. at 21; 438 U.S. at 244; 431 U.S. at 25–32; 431 U.S. at 22–26; 438 U.S. at 248; and 438 U.S. at 245.

wonderful ease about suspension of performance, which makes it an attractive option for a party facing non-performance by its counterparty. Suspension is easy, quick and cheap. It does not require a lawsuit to be filed, or any kind of third-party decision or approval to be obtained. For this very reason, suspension is considered a "self-help" remedy. Furthermore, suspension can be an effective tool for persuading the other party to rectify its behaviour. What is being suspended, be it a payment or a delivery, will be supplied to the other party only if and when the other party corrects its behaviour. Like other self-help remedies, suspension promotes the private settlement of disputes, lessening the burden on courts and reducing the costs of settlement. The ease and private nature of suspension carry, however, the potential for abuse, which is why courts have built safeguards to prevent the suspension right from being abused. As suspension depends only on the aggrieved party's own assessment of the circumstances surrounding the breach, there is no possibility for an independent third party (like a judge) to review the matter, at least prior to the suspension. The safeguards built by courts are based on the concept of "material breach": a party is entitled to suspend performance only when the other party has committed a "material breach" of its obligations [3]. In the absence of a "material breach" by the other party, a party would by suspension violate its obligations [4]. The concept of "material breach" represents a balance struck by courts, in answering the question: "Will it be more conformable to justice in the particular case to free the injured party, or, on the other hand, to require her to perform her promise, in both cases giving her a right of action if the failure to perform was wrongful? [5]" As stated in this question, the right of action for a wrongful failure to perform (i.e. seeking damages or other relief) is a separate issue from the right to suspend performance. In other words, even if a breach is not material, the injured party may still be able to bring an action for damages or other relief, although the injured party would remain bound to perform its obligations. The concept of "substantial performance" is closely related to the concept of "material breach". Substantial performance is performance without material breach [6].

### Material breach

A key question thus becomes, when is a breach "material"? A breach is material when it goes to the "essence" or "heart" of the contract [7].

Factors considered in determining whether a breach is material include:

1. The extent to which the injured party will be deprived of the benefit it reasonably expected [8];

2. the extent to which the injured party can be adequately compensated for the benefit of which he will be deprived;

3. the extent to which the party failing to perform will suffer forfeiture;

4. the likelihood that the party failing to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and

5. the extent to which the behavior of the party failing to perform comports with standards of good faith and fair dealing [9].

It is irrelevant whether the injury suffered by the other party was foreseeable to the breaching party as a consequence of the breach. The time for determining materiality is the time of the breach and not the time that the contract was made. The first factor – extent of

deprivation of benefit reasonably expected – is the most important one, and often decisive in determining whether the breach is material. This first factor in turn may depend on the second factor, whether the injury can be adequately compensated by damages. An injury that can be adequately compensated by damages can lead to the conclusion that suspension is not justified as a means of protecting a reasonably expected benefit. As an alternative formulation of the first factor, courts sometimes look at whether the breach was so central as to defeat an "essential" or "primary" purpose of the contract. In State of Indiana v. IBM Corp., No. 49A02-1211-PL-875 (Court of Appeals of Indiana, Feb. 13, 2014), the Indiana court of appeals criticized the lower court's use of a balancing test comparing the benefits received by the State from the contract, to the benefits of which the State had been deprived as a result of IBM's breach. The State of Indiana had entered into a contract with IBM to modernize and improve the State's welfare system.

As the Indiana court of appeals wrote:

"Although ... IBM met some objectives and provided some important benefits, the question [in a material breach analysis] is whether IBM's failures went to the essence of the contract—to provide and expand access to services for welfare recipients in a timely, reliable, and efficient manner within federal guidelines, to discourage fraud, and to increase work-participation rates."

As for the third factor – forfeiture – it considers the potential impact on the breaching party from a suspension or termination of the contract. It is not the nature or gravity of the breach which is being considered here. Rather, it is a potential "forfeiture" or loss suffered by the breaching party as a result of suspension or termination, which is being considered. Where, for example, goods are specifically made for a particular buyer, a seller would be forced to forfeit the goods if the contract were cancelled because the seller would be unable to resell those goods to another buyer [10].

Another extreme example of forfeiture would be a security services contract, where a facility owner who delays in payment could suffer great forfeiture or loss if the security services provider suddenly stopped protecting the facility.

Notice and timing of suspension and other considerations

Although notice of suspension may not be strictly required [11], good practice would be for the suspending party to give notice of suspension to the other party. This notice would serve to alert the other party of the suspension, and provide for the possibility of communication between the parties on the situation having led to the suspension, as an attempt to resolve the issue.

As to the timing of suspension, a party wishing to suspend its performance should do so promptly upon learning of the other party's material breach. A party who continues to enjoy the benefits of the contract and fails to suspend its performance promptly, waives the right to suspend [12].

When a party decides to suspend performance, it must be careful to stop its continued enjoyment of any benefits provided by the other party. It is not possible for a party on the one hand, to suspend its performance (and later terminate the contract if the material breach by the other party is not cured), while enjoying the benefits received.

For example, the customer suspending payment due to a supplier's deficient performance, cannot at the same time continue enjoying use of any deliverables not paid for. If continued enjoyment of benefits received is important, then the party should instead claim damages, rather than suspend performance."

/s/ Darron Thomas

August 20, 2021.